

MARTIN W. KAFAFIAN (NJ, NY, DC BARS)
ADOLPH A. ROMEI (NJ, NY BARS)
JOHN J. LAMB (NJ BAR)
ANTIMO A. DEL VECCHIO (NJ, NY, DC BARS)
ROBERT A. BLASS (NJ, NY BARS)
ARTHUR N. CHAGARIS (NJ BAR)
STEVEN A. WEISFELD (NJ, NY BARS)
IRA E. WEINER (NJ BAR)
RENATA A. HELSTOSKI (NJ, NY BARS)
MICHAEL STERNLIEB (NJ BAR)
DANIELE CERVINO (NJ, NY BARS)
ARTHUR M. NEISS (NJ, NY BARS)
DANIEL L. STEINHAGEN (NJ, NY BARS)
MARTIN R. KAFAFIAN (NJ, NY BARS)

OF COUNSEL
ROGER W. BRESLIN, JR. (NJ BAR)
THOMAS W. DUNN (NJ BAR)
DANA B. COBB (NJ, NY BARS)
IRA J. KALTMAN (NJ, NY BARS)
MARY ELLEN B. OFFER (NJ, NY BARS)
EMERY C. DUELL (NJ, NY BARS)
JOSEPH A. RIZZI (NJ BAR)
PATRICK J. MONAGHAN, JR. (NJ, NY BARS)

COUNSELLORS AT LAW
200 MARKET STREET, SUITE 401
MONTVALE, NEW JERSEY 07645

(201) 573-1810

www.beattielaw.com

NEW YORK OFFICE:
99 MAIN STREET, SUITE 319
NYACK, NEW YORK 10960
(845) 512-8584

COUNSEL TO THE FIRM
BRENDA J. STEWART (NJ BAR)
JAMES V. ZARRILLO (NJ, NY BARS)
JEANETTE A. ODYNSKI (NJ, NY BARS)
CRISTIN M. KEEGAN (NJ, NY BARS)
MARIYA GONOR (NJ, NY BARS)

IAN M. EASTWICK (NJ, NY BARS)
KIMBERLEY A. BRUNNER (NJ, NY BARS)
JOSEPH A. DIPISA III (NJ, NY BARS)
JASON A. CHERCHIA (NJ, NY BARS)

RALPH J. PADOVANO (1935-2016)
JAMES R. BEATTIE (1935-2021)

Reply to New Jersey Office
Writer's Direct Access
Email:  mrk@beattielaw.com
Direct Dial and Fax:  201-799-2102

February 14, 2022

*Via ECF*
The Honorable Edward S. Kiel, U.S.M.J.
United States District Court for the District of New Jersey
Frank R. Lautenberg U.S. Post Office & Courthouse Building
2 Federal Square, Courtroom 8
Newark, New Jersey 07102

      **Re:**   *Al Ummah Community Center., v. Teaneck, et al.*, Case No. 2:20-cv-14181 (KM)(ESK)
            **Response to Letter of Counsel regarding Claims of Deficient Discovery**

Dear Judge Kiel:

This firm represents defendants the Teaneck Zoning Board of Adjustment ("ZBA"). The parties are scheduled to appear before Your Honor on a conference call Monday, February 14, 2022. On February 11, 2022, we were copied on a letter that Plaintiff's counsel submitted to the Court ("February 11 Letter"). The February 11 Letter, Plaintiff's latest effort to villainize the ZBA, alleges, among other things, that the ZBA has engaged in frivolous conduct in connection with responding to discovery. We write to address Plaintiffs' various allegations.

## PROCEDURAL HISTORY

Initially, this Firm represented the ZBA and the ZBA's members (the "Individual Members"), who were named in their official and individual capacities. At noon on October 25, 2021, we filed a Motion to Withdraw as Counsel for the Individual Members. *See* ECF No. 39. At 5:50 p.m. on that same day, October 25, 2021, Plaintiffs served via email their First Set of Discovery Demands and Interrogatories to Each Defendant (the "Interrogatories").

In the months that followed, we met and conferred several times with Plaintiff's counsel regarding the fact that our ability to make disclosures under Rule 26(a), participate in an ESI conference, and respond to discovery would be affected by our application to withdraw and the outcome thereof. Certain of issue was brought before the Court. *See, e.g.*, ECF No. 51,

*Fifty-Two Years of Service*

Hon. Edward S. Kiel, U.S.M.J.
February 14, 2022
Page 2

December 1, 2021 Letter of Martin R. Kafafian ("December 1 Letter"). Specifically, we sought to hold in abeyance our obligations under Rule 26(a) and with respect to participate in an ESI Discovery Conference (i.e., the predicate undertakings to written discovery); Over Plaintiffs' objection, the Court ultimately agreed that the issues raised in my December 1 Letter would abide the outcome of our Motion to Withdraw. *See* ECF No. 53, Text Order dated December 2, 2021.

Our Motion to Withdraw was later granted (*see* ECF No. 55) and the Individual Members obtained new counsel, who had all appeared by January 18, 2022. As a result, the ZBA has moved forward with responding to discovery.

## INTERROGATORIES

*Interrogatories 2 through 6 and 24*

The Interrogatories were served on all defendants, namely, the Township of Teaneck, the ZBA, Dan Melfi, and the individual members of the ZBA. As a result, Plaintiff's Interrogatories were not tailored to any given defendant. Several of the Interrogatories—such as numbers 2 through 6 and 24—seek information regarding conversations. The ZBA is a body politic, a legal fiction and, as such, is unable to hold a conversation. Thus, the ZBA interposed an objection to interrogatories seeking information about such conversations on the basis that the ZBA, as a legal fiction, was incapable of participating in any such conversations. The ZBA notes that its constituent Individual Members *may* be able to provide information about such conversations, to the extent they exist. But those Individual Members are parties to this litigation and are now represented by separate counsel. Information about such conversations should be sought from the Individual Members and the attorneys that represent them.

*Interrogatory 14 & 15*

Interrogatories 14 and 15 ask the ZBA to identify all "religious entities" and "secular entities" that received any approval for variances, and to produce all materials related to those approvals. These interrogatories are problematic for several reasons.

*First*, the terms "religious entities" and "secular entities" are not defined.[1] Thus, these interrogatories are vague and ambiguous.

*Second*, even if those terms were defined, these interrogatories would require the ZBA to make determinations about whether a given applicant is religious or secular. In theory, the ZBA could

---

[1] The ZBA notes that Plaintiffs' Interrogatories include a definition for "Religious *Organization*" (emphasis supplied), which is defined as "include[ing], but [] not limited to, churches, mosques, synagogues, temples, nondenominational ministries, interdenominational ministries and ecumenical organizations, mission organizations, faith based social agencies, and other entities whose principal purpose is the study, practice or advancement of religion." But this defined term is not used in Interrogatory 14.

Hon. Edward S. Kiel, U.S.M.J.
February 14, 2022
Page 3

make such determinations where the applicant identified itself as a church or mosque or synagogue. But say Plaintiffs' definition of "religious entity" tracked their definition of "Religious Organization" to include entities "mission organizations, faith based social agencies, and other entities whose principal purpose is the study, practice or advancement of religion." It is unlikely that the ZBA would have information enabling it to make determinations about whether a given applicant falls within this definition because, in many instances, the information necessary to make such a determination would not be presented to the ZBA.

*Third*, these interrogatories appear to draw a dichotomy—that a ZBA applicant is either religious or secular. Thus, between these two interrogatories, the ZBA must list *every* variance applicant that has ever come before it. Moreover, the interrogatories require that the ZBA produce all "materials" related to all of these applications. Over the past decade, the ZBA receives between 45-65 variance applications annually (with the exception of 2020, when it received only 30, and 2013, when it received 79). The file for each commercial variance application often contains hundreds of pages. And the Interrogatories are not limited by year. But even if these interrogatories were limited to the past ten years, responding would require producing tens of thousands of pages. Many (if not most) of these applications—e.g., to expand a deck on a single-family home—are totally irrelevant to this litigation, as noted in the January 20, 2022 letter from Thomas Hanrahan, Esq. These interrogatories conceivably seek hundreds of thousands of pages, maybe even more. Accordingly, these interrogatories are overbroad, unduly burdensome, and not reasonably tailored to the needs of this case.

<u>Interrogatory 16</u>

Plaintiffs also take issue with the ZBA's response to Interrogatory 16, which asks the ZBA to "identify any entity that sought/requested an ADA compliant ramp."[2] This interrogatory is problematic for several reasons.

*First*, Interrogatory 16 is structurally and syntactically infirm. The Interrogatories do not contain a definition for the term "ADA compliant ramp." The Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* does not define, or even use, the term "ramp." The regulations that implement the Americans with Disabilities Act identify numerous types of ramps. For example, 28 C.F.R. § 35.151(b)(4)(ii)(A), when referring to an accessible path of travel for State and Local Government Facilities, states, "An accessible path of travel may consist of walks and sidewalks, *curb ramps* and other interior or exterior *pedestrian ramps*; clear floor paths through lobbies, corridors, rooms, and other improved areas; parking access aisles; elevators and lifts; or a combination of these elements." *Id.* (emphasis supplied). Identical language exists at 28 CFR 36.403(e)(2) regarding places of accommodation. The regulations implementing the Americans with Disabilities Act defines the term "ramp" as "A walking surface that has a running slope steeper than 1:20[.]" 36 C.F.R. 1191, App. B, §106.5. This

---

[2] As above, Interrogatory 16 was served on *all* defendants. The ZBA has responded to these Interrogatories to the extent that they implicate the ZBA. If Interrogatory 16 sought information about applications to other bodies within the municipality, the ZBA is not in a position to respond on their behalf.

Hon. Edward S. Kiel, U.S.M.J.
February 14, 2022
Page 4

definition applies to any sidewalk that has even a modest slope. But more importantly, it is unclear what is meant by "sought/requested" a ramp. The law imposes an obligation on landowners with respect to ADA compliance, an obligation that is triggered in *every* non-residential application before the ZBA and Planning Board. *See* 28 C.F.R. 36.401(a)(1) (regarding new construction) *and* 28 C.F.R. 36.402(a)(1) (regarding alterations to existing structures).

*Second*, Interrogatory 16 is overbroad. Since 2014, the ZBA has heard at least 50 applications that may have triggered the ADA compliance.[3] This does not include applications before the Planning Board, which also triggers ADA compliance. As with the above, there are conceivably hundreds-of-thousands of pages of paper files that would be responsive to this request. Plaintiffs have not articulated how this information is relevant or would lead to admissible evidence. The request is simply not tailored to the needs of this case.

*Third*, Interrogatory 16 is improper insofar as it asks the ZBA to review, on the Plaintiffs' behalf, every land use application that has ever triggered the ADA regulations and analyze whether that applicant "sought/requested" a ramp. Rule 33 does not obligate the ZBA to generate work product.

## STATUS OF DOCUMENT PRODUCTION

On January 21, 2022, the defendants responded to Plaintiff's Document Production Request by producing the entire 50 Oakdene Avenue file, that is, the True Light Presbyterian Church Zoning Board file, the AUCC Zoning Board file, the AUCC Building Department file, the AUCC Zoning Officer file, and the AUCC Zoning Violations file, Bates-stamped as TEANECK 00001 through TEANECK 02943, inclusive of plans, designs, maps, applications, reports, transcripts, and other documents.

As detailed in the January 20, 2022 letter of Thomas Hanrahan, Esq., (ECF No. 66), the ZBA is currently processing and reviewing more than a dozen other land use applications that are maintained in paper format, which include large-scale site plans and architectural plans that require additional effort and specialized equipment to digitize and process. The ZBA is also reviewing twelve years' worth of emails. The production must now be reviewed by four sets of attorneys. This is incredibly labor intensive.

Respectfully submitted,

*/s/ Martin R. Kafafian*
Martin R. Kafafian

Cc:   Counsel of Record (*via ECF only*)

---

[3] The Interrogatory is not bounded by time.

4222295_2\200760