Aymen A. Aboushi, Esq.
The Aboushi Law Firm, PLLC
1441 Broadway, 5th Floor
New York, NY 10018
Tel. 212.391.8500
Fax 212.391.8508
Aymen@Aboushi.com
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

| | |
|---|---|
| AL UMMAH COMMUNITY CENTER, AKA, AUCC FAMILY, EDUCATION AND FAITH CENTER, a New Jersey Non-Profit Corporation, RAY OF SUNSHINE FOUNDATION INC., a New Jersey Non-Profit Corporation, | |
| Plaintiffs, | **AMENDED COMPLAINT** |
| v. | Civil Action No.: 2:20-cv-14181 (KM)(ESK) |
| TEANECK, TEANECK ZONING BOARD OF ADJUSTMENT, and its Members, HARVEY ROSEN, DANIEL WETRIN, MONICA HONIS, JENNIFER PRINCE, JERRY L. BARTA, EDWARD MULLIGAN, ATIF REHMAN, MARK MERMELSTEIN, ZEV GREEN, JAMES BROWN, in their individual and official capacities, DAN MELFI, individually and in his official capacity, ADAM MYSZKA, individually and in his official capacity, and JOHN AND JANE DOES 1-20, in their individual and official capacities, | |
| Defendants. | |

**INTRODUCTION**

This case is about religious liberties and the discriminatory and unequal practices of the Teaneck, its employees, and its Zoning Board of Adjustments.  Plaintiffs are New Jersey religious not for profit, 501(c)(3) charitable corporations with offices in Teaneck, New Jersey. They simply seek to build an Islamic Center that contains amenities for its members, just as other religious and secular organizations in Teaneck have done for years. Despite years and thousands of dollars spent to appease the Defendants' unlawful and discriminatory requirements, Defendants continue to act in violation of the Constitutions of the United States and New Jersey, as well as the Federal law explicitly prohibiting religious discrimination by discriminating against the Plaintiffs and imposing an unlawful burden on the practice of their faith.  Plaintiffs now come before this Honorable Court to have the Defendants comply with the Constitutions of the United States and New Jersey, Federal and State Law, and end their unlawful and discriminatory conduct inhibiting religious liberties guaranteed in this great Country and State.

**JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§§ Sections 1331, 1343(a)(4), 42 U.S.C. §2000cc et seq. ("RLUIPA"), The Equal Protection Clause of the 14th Amendment to the United States Constitution; and 42 U.S.C. § 1983, which provides redress for the deprivation, under color of state law, of rights, privileges and immunities secured to all citizens and persons within the jurisdiction of the United States by the Constitution and laws of the United States.

2.      Venue is proper in the United States District Court for the District of New Jersey under 28 U.S.C. Section 1391(b) as all acts complained of occurred within this District.

2

3.      Plaintiff seeks declaratory and injunctive relief against the Defendants pursuant to 28 U.S.C. §§ 2201 and 2202 and injunctive relief pursuant to 42 U.S.C. § 3613(c)(1).

4.      In addition, 28 U.S.C. § 1367 confers supplemental jurisdiction on this Court over Plaintiff's related state law claims.

## PARTIES

5.      Plaintiffs are a New Jersey, not for profit, 501(c)(3) tax exempt Religious Corporations.  Their principal place of business is in Teaneck, NJ.

6.      Plaintiffs are Islamic based organizations, whose mission includes operating an Islamic Center for its members to have religious services, congregations, prayers, as well as other amenities.

7.      The Township of Teaneck is a municipal corporation and organized under the law of the State of New Jersey, located in Teaneck, NJ.

8.      Defendant Teaneck Zoning Board of Adjustment ("Teaneck" or "BOA") is an entity/arm of Defendant Teaneck and acts on its behalf with regards to real property permits, zoning, and applications.

9.      Defendants Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown are employed by Defendant Teaneck, and or acting on its behalf, by way of the Teaneck Zoning Board of Adjustments. They are named herein in their individual and official capacities and are collectively referred to herein with the Board of Adjustments as "BOA."

3

10.     Defendant Dan Melfi is senior zoning officer employed by Defendant Teaneck and holds considerable sway and input regarding permits, approvals, and variances. He is named herein in his individual and official capacity.

11.     Defendant Melfi is the highest authority regarding permits for the Township and his denial is the final decision for the Township – a denial from Melfi means an applicant must then go before the Board of Adjustments.

12.     Defendant Adam Myszka is an official that is employed by Defendant Teaneck and issues summons on behalf of the Township.

13.     Defendants John and Jane Does 1-20 are fictitious parties who are presently unknown who may have knowledge or involvement with the underlying facts and events in this action and participated in the unlawful conduct as alleged herein. They are named individually and in their official capacities.

14.     Each of the Defendants participated in the conduct complained of herein personally and directly.

**STATEMENT OF FACTS**

15.     The subject property is located at 50 Oakdene Ave, Teaneck, NJ 07666 ("Site")

16.     The Site is a two-story building and was a former public school.

17.     The Site sits on more than 2.25 acres.

18.     The Site has a stand-alone parking lot.

19.     The Site sits on a corner, with three street exposures and one property line adjacent to the end of the site, next to the parking lot.

20.     The school was decommissioned and sold to a Church.

4

21.     The Church used the Site for religious purposes, including congregation, instruction, and gatherings.

22.     The in addition to religious instruction, the former Church also used the Site for schooling and other activities, including community events and religious celebrations.

23.     Upon information and belief, in construing the Church's application to operate a church and community center at the Site, Defendant Teaneck/BOA permitted the Church to rely upon street parking in the parking calculation.

24.     Moreover, the Church was granted direct approval, without going through the Board of Adjustments, for a ramp to permit wheelchair access to the property.

25.     After years of occupancy, the Church sold the Site to Plaintiffs.

26.     The Plaintiffs sought various approvals to the Site to turn it into an Islamic Community Center, that included a daycare.

27.     At the onset of the project, Plaintiffs were unequivocally clear that they intended to open a religious house of worship, including but not limited to, including that it's an Islamic-based Faith Center in its official name and disclosing their intent to use the Site as a house of worship on its application. The Islamic Center would also permit the execution of Islamic Principles, including having teaching Islam and having classes regarding Islam, forging fellowship between Muslims who come and use the Islamic Center, and having Islamic-complaint separated activities for boys and girls.

28.     Without just cause, the daycare application was unlawfully delayed, which resulted in Plaintiffs' inability to open the daycare on time to accept students.

5

29.     The Plaintiffs met with Teaneck Officials, including Defendant Melfi, the senior and sole zoning officer in Teaneck, and reviewed the proposed plans and uses for the Site.

30.     Plaintiffs were questioned significantly regarding the proposed Islamic Center, its religious use, even questioning the name, which simply means community in Arabic.

31.     Plaintiffs were urged by Defendant Melfi and other Township officials to use an acronym for the Center, rather than the full name, because the full name in Arabic might cause problems for the project.

32.     Plaintiffs relied on Defendant Melfi's guidance because Defendant Melfi was the ultimate decisionmaker and he possessed final authority in the approval of zoning related applications for Teaneck as their senior and sole zoning officer.

33.     The Plaintiffs were encouraged by Defendant Melfi and other officials to minimize the fact that it would be an Islamic Center so as to "fly under the radar" and not incur the ire of the Town and its residents and officials.

34.     Despite no obligation to do so, Plaintiffs have continually met with town officials since 2018 on several occasions, each time changing their plans at the behest of Teaneck officials in order to ensure swift and seamless approvals.

35.     This included limiting the prayer space, and other religious activities at the Site.

36.     Defendant Melfi, in his official capacity as the senior zoning official of Teaneck, made several representations to the Plaintiffs, including that the revisions were acceptable and that the Plaintiffs would receive swift approvals.

37.    Plaintiffs' changed the nature and character of the Center to appease town officials, including downplaying the Islamic Nature of the center, and minimizing the prayer space aspect of their house of worship.

38.    Given the generous space at the Site, Plaintiffs were urged by the Town to add a pool so that Teaneck's swimming clubs and high school could use it to practice and compete.

39.    It was relayed to Plaintiffs that Teaneck did not have a pool for its swim team and adding one would be a huge asset for the Town as well as a place the high school swim team could practice.

40.    Plaintiffs obliged Defendants, and at considerable cost and expense, added the pool and pool house to the plans for use by its members and the Teaneck High School.

41.    The Pool would also accommodate the members of the Islamic Center, as men and women would be able to swim separately, at different times, in accordance with Islamic traditions.

42.    Plaintiffs presented the plans to the Defendants before a formal submission was made to the permit office, and the Defendants, including Defendant Melfi, assured Plaintiffs that the plans would be approved without any issues.

43.    Despite these approvals, Defendant Melfi and the Township rejected the Islamic Center's plans, unnecessarily necessitating the Plaintiffs to go before the BOA for approvals.

44.    When it came time for Plaintiffs' application to be reviewed, the Islamic Center became a point of contention where both the public and the BOA, including Defendant Rehman, questioned Plaintiffs about it ad nauseum.

7

45.    Initially, the plans had 63 parking spaces, which Defendant Melfi deemed to be sufficient. This was vastly different that Defendant's Melfi's subsequent claim that the Site required 300 parking spaces, which he knew would be prohibitive for the site and did not comport with the requirements placed on the School or Church that previously occupied the structure.

46.    The pre-approved plans did not contain any significant changes or uses and were in compliance with the existing zoning laws.

47.    Indeed, amongst other items, there was the request in the plans for an American with Disabilities Act ("ADA") compliant ramp, an ADA-complaint elevator, minor parking adjustments, minor adjustments to the heights for fence and retaining wall, the town-proposed pool, a roundabout driveway so children can be dropped off and picked up easily, and minor increase in lot coverage.

48.    Additionally, the Site was in the Public Zoning area, and by statute, recreational facilities and associated uses were per se permitted.

49.    No variance or appeal to the BOA is required and the permit should have been granted outright.

50.    According to Defendants' very zoning statutes, the Public Zone, in which the Site is located, does not have any conditional uses, dimensional, density and other bulk restrictions, or any other provisions and requirements.

51.    As laid out herein, the outright rejection of the Plaintiffs' application for a permit violated the explicit terms of the P Zoning laws.

8

52.      This was a discriminatory act by the Defendants that unequally applied the zoning laws and permit applications.

53.      Plaintiffs submitted their pre-approved plans, which then became subject to public backlash at the proposed Islamic Center.

54.      Much to the shock of Plaintiffs, the pre-approved plans were swiftly rejected by Defendants Melfi and Teaneck, who alleged a number of "deficiencies."

55.      Defendants then undertook a course of conduct in which they engaged in further conduct to obstruct the project, as well as discriminate against Plaintiffs.

56.      Defendant Teaneck, though its highest zoning policy maker, Defendant Melfi, denied Plaintiffs' request for work permits on several occasions, the first of which occurred on August 29, 2019.

57.      The August 29, 2019, denial of work permits cited the alleged lack of a proposed site plan and zoning chart with calculations as the basis for the denial of the ADA ramp, citing Municipal Zoning Ordinance Section 33-23(d)(3)(a).

58.      However, a plenary review of the cited provision reveals that it is only applicable where there is a commencement of a use, or change of use, or the erection, construction, reconstruction, alteration, conversion or installation of a structure or building, which is clearly inapplicable to Plaintiffs' application.

59.      Despite the foregoing, Plaintiffs amended their application and resubmitted its request for the work permit.

60.      Defendant Teaneck, by and through their highest zoning policy maker Defendant Dan Melfi, denied Plaintiffs' requests again on September 10, 2019.

61.     The September 10, 2019 denials stated that zoning board approval was required, and that the permits may not be issued on properties with outstanding violations.

62.     Plaintiffs should not have been subjected to the zoning board process because, based on Defendants' own zoning statutes, the Site was located in the Public Lands Zone, which does not require zoning board approval.

63.     Furthermore, the alleged violations barring the issuance of the permits were nonexistent, and the only violations associated with the site were issued after Defendant Teaneck's denials, and only served as additional false pretenses to deny Plaintiffs' application.

64.     In fact, there were no violations on the site – Defendants sought to cover their tracks by writing violations afterwards to justify the denial.

65.     Upon information and belief, Defendant Adam Myszka collaborated with Defendants Teaneck and Melfi to cover their tracks by issuing frivolous violations and manufactured a reason to deny Plaintiffs' permit applications.

66.     Adam Myszka took direct action as well as aided and abetted the Defendants by writing frivolous summonses so that the Defendants would have yet another, false, reason to deny Plaintiff's request for a permit.

67.     Upon information and belief, Defendant Myszka and Melfi collaborated so that Defendant Myszka would issue summons to the Plaintiffs for infractions AFTER Plaintiffs applied for permits so that there was a manufactured and false basis to refuse Plaintiff permits.

68.     Defendants Teaneck and Melfi refused to approve Plaintiffs' application to modify an existing fence, then proceeded to collaborate with Defendant Myszka to issue a violation for the very same fence.

10

69.    Defendants Teaneck and Melfi continued their discriminatory conduct with additional denials of work permits, including but not limited to refusals dated October 2, 2019 and November 25, 2019, wherein the basis of their denials remain unclear because they cited a number of municipal zoning ordinance sections that do not apply to Plaintiffs.

70.    Despite the fact that Plaintiffs' application was pre-approved and did not require zoning board approval, Defendants proceeded to reject all of the pre-approved proposals and required Plaintiffs to go before the Defendant BOA.

71.    The BOA process was a sham aimed at delaying and denying the application and bleeding Plaintiffs, a non-profit, of precious funds.

72.    Despite having no obligation to do so, and in an effort of appeasement, Plaintiffs applied to the BOA as instructed.

73.    Almost immediately, the BOA process was exposed as a farce.

74.    The individually named Defendants acted as a collective unit to prevent Plaintiffs from opening their house of worship and provide a space for members of their community who wished to pray and exercise their religion at the community center.

75.    Each of the individually-named Defendants acted in unison with the collective purpose to sabotage Plaintiffs' application in accord with Defendants Teaneck, Melfi and Myszka's prior actions in order to prevent the AUCC from ever opening.

76.    The BOA held a number of public hearings wherein members of the public were allowed to ask Plaintiffs questions about their proposal. Defendant Rosen encouraged members of the public to continue asking questions without limit or care for how long the questioning

11

went on for, or whether or not the questions posed were duplicative and therefore a waste of time.

77.     When Plaintiffs pointed out the duplicative questions, Defendant Rosen insisted that they answer each and every one of them again.

78.     In relation to the daycare, the Plaintiffs were questioned ad nauseum regarding the "curriculum."

79.     At one of these hearings, Defendant Board Member Atif Rehman pointed out that a Semitic application was not scrutinized the way Plaintiffs' application was scrutinized.

80.     At a subsequent hearing, Defendant Board Member Atif Rehman also pointed out that the BOA was handling Plaintiffs' application differently from other applications – where the BOA normally limited the number of times townspeople could come back to object, they refused to do the same for Plaintiffs and chose instead to re-open the matter, allowing townspeople to come back and object time and time again, taking up valuable time and subjecting Plaintiffs to endless questioning and increased costs.

81.     Defendants Rose, Asadurian and Meyer continuously held up Plaintiffs' application and allowed objectors to waste Plaintiffs' allotted time at these hearings in a clear effort to terminate, or at best, stall and delay the project.

82.     These delay tactics only served to show Plaintiffs that their efforts were futile – Defendants had no intention of approving the proposal but continued to hold one-sided hearings and adjourned meetings after meetings, all the while charging Plaintiffs tens of thousands of dollars for them.

83.     The Plaintiffs were also questioned regarding their prayer services at these hearings, and if they would be having Friday prayers and regular prayers throughout the day.

84.     Defendants implied to Plaintiffs that they should not hold prayer services at the Site on a regular basis, despite the fact that Plaintiffs are religious institutions.

85.     No other religious organization was subject to the same restrictions.

86.     The Defendants' actions regarding the prayers were made in an effort to discourage prayer services and to have the Plaintiffs limit their prayer service and religious exercise.

87.     This was clearly an unreasonable burden upon Plaintiffs and their ability to freely exercise their religion.

88.     The reference regarding the curriculum and prayer services was a thinly veiled attack on the Islamic nature of the project.

89.     The Defendants were apparently concerned that Islamic teaching would be taught at the Islamic Center, and this was the unlawful reason why the daycare, permits, and variance applications were held up and denied.

90.     In no other situation was the curriculum of a daycare included in an application.

91.     No other religious organization have had to answer questions regarding their "curriculum" or what would be taught at the daycare or school.

92.     Indeed, other religious groups and secular institutions operate daycares, and yet none of them had to endure questioning regarding their curriculum.

93.     The previous Church located at the Site was granted permission to maintain a religious school and daycare at the Site without any of the regulation, expense, or delay imposed upon the Plaintiffs by the Defendants.

94.     Despite the foregoing, Defendants continued to obstruct Plaintiffs' attempts to open their house of worship and community center with its inexplicable denials and an endless and futile BOA process.

95.     As to the other matters that the Defendants forced Plaintiffs to bring before the BOA, it was clear that these issues would not be meaningfully considered, and that Plaintiffs would be subject to substantial burdens and unequal treatment.

96.     Many of the Plaintiffs' requests were minor in nature, including that the roundabout driveway is 145 feet away from the roadway where 150 feet is required.

97.     Another minor request was the ADA ramp-a ramp that the Defendants previously granted to a Church in two days.

98.     Defendant Melfi then imposed numerous onerous requirements upon the Plaintiffs, many of which he knew did not apply or he was applying on unequal terms.

99.     For example, despite being in a Public Zone, which does not have dimensional, bulk, or conditional use requirements, Defendants Melfi and Teaneck imposed dimensional, bulk, and conditional use requirements upon the Plaintiffs.

100.    Even though there are no applicable dimensional, bulk, and conditional use requirements, such requirements were discriminatorily imposed upon Plaintiffs in denying their permit.

14

101.    No Christian or Jewish organizations had the same non-applicable zoning requirements imposed upon them, and instead they were correctly subject to the zoning requirements in their zoning area.

102.    Among other things, Defendants Teaneck, Melfi, and the BOA and its members arbitrarily applied a zoning ordinance to Plaintiffs but followed different standards to similar proposed land uses by non-Muslim houses of worship and by secular property owners.

103.    Similarly, secular projects were not subject to the superimposed zoning requirements from another zoning area.

104.    In fact, secular projects were given carte blanche to build as they saw fit as the Defendants waived nearly every major zoning requirement and granted significant and substantial variances to them.

105.    Indeed, in regards to several recent developments on State Street in Teaneck, the Defendants waived nearly every zoning requirement so that these secular projects could be built.

106.    This included significant variances and waivers, included by not limited to, waiving parking, density, and height requirements, and other significant zoning rules and regulations.

107.    The Plaintiffs, on the other hand, were forced to comply with inapplicable zoning rules and were subject to years of delay and denials for minor variances and/or permissible changes.

108.    Even more egregiously, Plaintiffs were subjected to endless conversations about arbitrary "issues" like snow removal despite there being no requirement regarding snow removal in any applicable code, rule or regulation.

15

109.    Defendant Mulligan repeatedly questioned Plaintiffs regarding snow removal with an aggressive tone while falsely suggesting that Plaintiffs were trying to involve the BOA in potentially illegal activity.

110.    The denials were clearly aimed at denying Plaintiffs the right to operate the Islamic Center, and were clearly made in a discriminatory fashion in violation of Federal and State law.

111.    Defendants' actions directly interfered with Plaintiffs' ability to use the Site as a house of worship to exercise their religion and open the center for the community.

112.    Further, a review of the uses and requests of the previous Church and the Islamic Center reveal a glaring double standard to inhibit the Islamic Center.

113.    The Church was instantly and seamlessly granted several application approvals and variances that are identical to the one sought by Plaintiffs.

114.    The Plaintiffs, on the other hand, had its applications rejected outright and was forced to endure an endless and pointless BOA process whereby its applications were never fully considered or not considered in accordance with the same standards as the Church, secular institutions, and other religious projects.

115.    For example, the Church was permitted to build a ramp, but the Plaintiffs could not.

116.    Moreover, the Church was not required to pay any fees or costs. The Plaintiffs Islamic Center, however, was not only required to pay significant application fees, but were also required to pay tens of thousands of dollars in costs to fund the unlawful opposition against them.

16

117.    In yet another example, while the Church was permitted to maintain a prayer space, Defendants refused to permit Plaintiff to maintain the exact same prayer space.

118.    Despite the fact that Plaintiff in no way changed the size of the prayer space that the church had used, the Defendants refused to permit Plaintiff to utilize the same space for a mosque and spiritual center.

119.    Defendants refused to provide even a temporary certificate of occupancy so that the prayer space and Islamic Center may lawfully be used.

120.    Defendants have given temporary certificates of occupancy to other secular institutions and religious facilities but refuse to do same for the Islamic Center.

121.    As a direct result of Defendants' denial to issue even a temporary certificate of occupancy, Plaintiffs have been denied an opportunity to open their Islamic community center at any capacity. Plaintiffs are unable to serve their community, even at a minimal capacity, nor are they able to provide any space for religious activities, including but not limited to, congregating.

122.    Despite passing all inspections and uses inside the Islamic Center, Defendants refuse to temporarily permit them to use it as they have permitted other religious and secular entities to do.

123.    What is more, the Plaintiffs' use of the Site will no doubt produce less traffic, people, and interruption to the neighborhood than its previous use as a public school.

124.    As much was recognized by Teaneck when it granted the Church variances and permits that it refused to grant Plaintiffs.

125.    Yet, as with many other facets of the Plaintiffs' application, Teaneck imposed a double standard, refused to provide the Plaintiffs with the same permits and variances it once

gave to a Church at the same Site, and treated the Plaintiffs more stringently than secular and other religious buildings and developments.

126.    In yet another example, Defendants continued to purposefully misconstrue the Site as a recreational and a community facility, rather than the Religious Community Center it is.

127.    The purpose of this purposeful misconstruction is clear: by purposefully mislabeling it as both a recreational and a community facility, the Defendants believed they could usurp the guaranteed religious protections Plaintiffs are entitled to and could instead  assert additional unnecessary and onerous requirements upon the Plaintiffs with impunity  in order to inhibit and extinguish Plaintiffs from ever becoming functional.

128.    Defendants imposed onerous traffic calculations to require frivolous and astronomical amounts of parking at the Site.

129.    The Defendants' parking calculations were again aimed at inhibiting the use of the Islamic Center.

130.    According to Defendants perverted calculations, the Islamic Community Center proposed at the Site somehow would need more parking than the previous public school and church (which also had a daycare and school) underlined combined.

131.    In addition, unlike with other, non-Islamic religious institutions and secular developments, the Defendants refused to consider the ample parking available on the street.

132.    The Site, nearly 2.25 acres, had ample street parking surrounding it.

133.    Rather than take into account the street parking around the Site, as they had done for other secular projects and non-Islamic religious institutions, Defendants refused to consider the ample street parking in denying Plaintiffs their permits and application.

18

134.   What is more, rather than simply apply straight forward calculations regarding parking, the Defendants nefariously double and triple counted the need for parking simply to ensure that there was no way that the Islamic Community Center could produce the requisite parking spaces needed to function.

135.   Defendant Rosen insisted that the Plaintiffs failed to properly consider the number of parking spaces and questioned them endlessly – forcing Plaintiffs to go into extreme details regarding potential events and other alleged considerations when there are specific calculations that would properly account for the necessary number of parking spaces.

136.   For example, the Defendants counted the daycare, religious instruction, and Islamic Community Center (erroneously calculated as a recreational center) as being used at all times simultaneously to artificially increase the parking spaces required to inhibit the establishments and use of the Islamic Center.

137.   Astonishingly, while Defendants sought to impose these novel and ridiculous interpretations for setback, parking, and other issues for the Islamic Center, they were literally changing the zoning codes to accommodate secular developments blocks away.

138.   Defendants virtually threw out their zoning laws in granting astounding permits and variances to various secular projects.

139.   By way of example, the Defendants dispensed with the longstanding zoning law that limited any building height to three stories in favor of a development that requested, and was granted, the right to build fifteen stories.

140.   Additionally, unlike the unreasonable and unfounded parking analysis Defendants imposed upon the Islamic Center, secular projects were given favorable treatment that included

not double and triple counting uses for parking purposes, taking into account street parking when analyzing parking spaces, and permitting these projects to maintain less parking spaces that zoning laws required.

141.    What is more, several developments were given permits/variances to use one parking space as a tandem space, thereby multiplying the same parking space for parking analysis proposes.

142.    While the Defendants were waiving numerous zoning and code laws to accommodate these developments, they were imposing onerous and harsh rules against the Islamic Center, including denying the request to build an ADA compliant ramp, and not permitting a round-about for the safe dropping off of children because it was a few feet short of the Defendants' request.

143.    Further magnifying the discrimination imposed upon the Islamic Center is the fact that, in denying the request to construct and ADA-compliant ramp, the Defendants claimed that the lot coverage number in the architect's plans were 57.1%, but that the engineering plans listed the lot coverage number as 57.2%, and thus the discrepancy of 0.01% was a basis to deny the permit. This for a property consisting of nearly two and a half acers.

144.    The ridiculousness of such a claim is astounding, particularly as the Defendants approved town-changing permits and variances to developers and makes clear that the Defendants denials are nothing more than cover for their discrimination.

145.    The Defendants' denial of the permit for the ADA ramp claimed that site plans were not submitted, when in fact the Plaintiffs did submit a site plan.

20

146.    Further, Defendants cited the same code provision in granting the Church's request for a ramp that they used to deny the ramp application for Plaintiffs.

147.    In granting the permit for the Church's ramp, Defendants cited Zoning Ordinance Article V, Section 33-23(d)(3)a, and stated that the ramp was permitted as a right.

148.    Stunningly, the Defendants used the very same Ordinance to deny the Plaintiffs' application for a ramp.

149.    In fact, unlike what they did to the Plaintiffs, the Defendants did not require the Church to obtain variances from the BOA.

150.    The application was granted outright.

151.    The permit for the Church's ramp was granted a mere two days after the Church submitted the request.

152.    Plaintiffs, on the other hand, have been subjected to the run around for nearly two years, and have no end in sight.

153.    The Defendants continued to treat the Plaintiffs in a manner vastly different than other religious organizations and secular entities.

154.    While the Islamic Center was being denied permission to install and ADA-Compliant ramp, or an elevator, developers were given permission to build fifteen floor towers in contravention of nearly every zoning rule in effect.

155.    Defendants continued their campaign of harassment and discrimination by issuing violations to the Plaintiffs for plainly lawful actions, such as moving a playground on the Site a few feet from its former location.

21

156.     The Site, a former School, is not required to obtain a permit to move a playground not far from where it was.

157.     Defendants than used these "violations" as an excuse to not grant any permits as Defendants claimed that they could not issue any permits due to outstanding violations.

158.     In addition, the Defendants refusal to issue a permit, or a variance, in the backdrop of issuing voluminous variances for secular properties, is on its face unfair, discriminatory, and unlawful.

159.     Defendants further discriminated against Plaintiffs by requiring them to pay tens of thousands of dollars to the Defendants' experts, simply to get the run around.

160.     Defendants forced Plaintiffs to place nearly thirty-five thousand dollars ($35,000) in escrow with Teaneck. Teaneck then used these funds to hire an army of professionals to oppose the Plaintiff, issue erroneous findings, and seek to justify the discrimination against Plaintiffs.

161.     Astoundingly, Defendants have used up the initial escrow, and are demanding that Plaintiffs plane an additional twenty-five thousand dollars ($25,000) in escrow to fund the unlawful discrimination against Plaintiffs.

162.     The additional twenty-five thousand dollars ($25,000) is not a cap, but only the next round of funds demanded by Defendants, with no end in sight.

163.     Plaintiffs have been told that if they do not fund the escrow, the Defendants will not entertain their applications-applications that should not be before the BOA but for the discriminatory actions of the Defendants.

164.     No other secular entity has been forced to make such a payment on similar issues.

165.    No other religious entity has been forced to make such a payment.

166.    Such conduct is on its face discriminatory, unlawful, and wreaks of bad faith.

167.    Indeed, there is no reason to spend that sum of money for the minor permits and/or variances Plaintiff seek, particularly when the Defendants are allowing more than six-major secular developments to proceed ahead of Plaintiffs, with less approval times, and no escrow amounts.

168.    Nor is it lawful to require the Plaintiffs, as a condition of entertaining its applications, to fund the unlawful and discriminatory fight against them.

169.    Yet another example of the unlawful conduct of Defendants is the constant and unilateral postponing of the hearing on Plaintiffs' applications.

170.    While the Defendants refuse to entertain Plaintiffs' applications, they continue to hear other matters and applications.

171.    This is in addition to the more than two years the Defendants have strung Plaintiffs along, all the while denying them relief and or moving the goal posts on them.

172.    Even when Plaintiffs have taken the course of appeasement, the Defendants find new, creative ways to inhibit the project-a clear sign that the goal is to delay the Islamic Center into perpetuity or until it runs out of funds.

173.    For example, when the Defendants asked for an increase in parking spaces after the initial application, Plaintiffs obliged despite the fact that they were not obligated to do so and the Defendants were granting variances to secular and other religious projects greater than any needed by the Islamic Center.

174.   In fact, when Defendants claimed that the initial 63 parking spaces, which Defendant Melfi claimed was initially sufficient, were not enough and that 93 parking spaces were required, the Plaintiffs downsized the project to create a total of 99 parking spaces.

175.   Plaintiffs achieved the greater parking spaces by removing outdoor fields where the congregants and their children could play, hold activities, and congregate, thereby downsizing and limiting the use of the Site.

176.   The Islamic Center also agreed to limit the number of persons at the Center, despite no obligation to do so, in order to further appease the onerous parking requirements imposed upon them.

177.   The Islamic Center's attempts at appeasement were met with yet another request for an increase in parking spaces.

178.   Despite increasing the parking spaces to more than Defendants requested, Defendants yet again moved the goal line and stated that 99 parking spaces were not enough, and now demanded nearly 300 parking spaces.

179.   Defendants' weaponizing of the zoning codes, which do not apply to Plaintiffs, was magnified when at a hearing it was revealed that a secular community center in Teaneck that was twelve percent bigger than the Islamic Center was required to have less parking than the Islamic Center.

180.   Stated differently, Defendant Melfi and the BOA imposed a greater parking requirement upon the Islamic Center than a larger secular Center.

181.    The Islamic Center was twelve percent smaller than this secular center, yet Defendants were imposing that the Islamic Center have parking greater than that of the secular center.

182.    The tripling of the parking spaces required was a clear signal that at no point would Defendants meaningfully consider the Plaintiffs' application and their intention was to delay the project to the point where Plaintiffs would either run out of money or be unable to obtain approvals.

183.    The current course of conduct is clearly aimed at inhibiting the project, and it has worked. There are no religious services and community members are not permitted on the site.

184.    The religious community center does not have a certificate of occupancy, temporary or otherwise, and is not allowed to have anyone there.

185.    The community center is not operational and continues to be defunct as a result of the Defendants' conduct.

186.    Defendants' actions cost the Plaintiffs a significant amount of time, money, and the ability to worship and practice their faith.

187.    Indeed, the Islamic Center cannot operate, and the daycare is vastly undersized due to the Defendants' unlawful restrictions.

188.    The Defendants' discriminatory and unequal treatment of Plaintiffs is glaring.

189.    In fact, at least one BOA Board Member recognized the unequal and discriminatory treatment Defendants were engaging in.

190.    A BOA Board Member stated on the record that certain requirements being imposed upon the Plaintiffs were discriminatory and unequal.

25

191.    In one instance, the Board Member publicly questioned why the BOA was imposing requirements for revisions where they had not imposed the same requirements upon Yeshivas or secular applications.

192.    In yet another instance, the same Board Member publicly questioned why the time for community opposition was extended and time for opposition was permitted to take precedence over the actual application, and take up the precious time.

193.    Indeed, the discrimination and unlawful conduct was so apparent, the BOA's attorney, on the record, admonished the BOA regarding its conduct and reminded them of the protections RLUIPA provides the Plaintiffs.

194.    The BOA ignored these warnings and instructions.

195.    In yet another example of the BOA's unlawful conduct, the BOA consistently permitted cross examination, questions, and other interruptions during each of Plaintiffs' witnesses, and continuously held up the application process in doing so.

196.    Hours upon hours were spent with Plaintiffs' professionals testifying before the BOA, with the BOA unlawfully permitting interruptions, unscheduled cross-examination, and other delays so as to run out the clock on the presentation and get absolutely nowhere.

197.    The BOA accomplished these delays both through their conduct and by permitting the public to intrude on the Plaintiffs' time.

198.    In every other matter, the applicant was permitted to put on its case, and cross examination is left to the end.

199.     Additionally, in every other application, cross-examination and public comments were limited, and the applicant was heard in a few meetings, which ultimately resulted in approval.

200.     Rather than pursue that efficient method, the Defendants purposefully and discriminatorily permit cross examination of every witness by every member of the public, thereby unlawfully elongating the process such that there will never be a true conclusion to the application.

201.     The BOA did not permit similar tactics with Yeshiva applications, or secular applications such as the developments discussed herein.

202.     While the BOA continuously delayed the consideration of the Plaintiffs' application, it continued to permit interruptions and nonsensical questioning from public opposition.

203.     While the BOA continued to claim that they did not have enough time to consider the Plaintiffs' application, it nonetheless continued to permit public opposition to the application use the majority of the time allotted to Plaintiffs.

204.     This not only caused a substantial delay to the consideration of the application, but also caused the Plaintiffs to incur substantial fees and costs.

205.     Additionally, the Defendants routinely threatened the Plaintiff with denials if the Plaintiffs did not consent to extending the time for the Defendants to "rule" on the application.

206.     Defendants routinely told Plaintiffs that if they did not extend the time for the BOA to "rule" on the application, which was unnecessarily prolonged by the BOA and its

erroneous demands for payment and other machinations, the BOA would vote immediately and deny the application.

207.   In fact, throughout several appearances before the BOA, Defendants expressed outright hostility toward the Plaintiffs, and indicated that they had pre-judged the application before it was complete and ready to deny it.

208.   Members of the BOA made several comments indicating that there was no legitimate consideration of the application, and the hearings were a charade that would simply end in a denial if the Plaintiffs could not be bled of their funds first.

209.   For example, several BOA members, including but not limited to Defendant Board Members Rosen and Brown, stated in aggressive tones, in sum and substance, that they were ready to deny the application on the spot (despite the fact that it was not yet fully presented), and that the application had little chance of being approved no matter what was suggested by Plaintiffs.

210.   Upon information and belief, Defendant Board Member Rosen initiated the motion to deny Plaintiffs' application, which was seconded by Defendant Board Member Brown, and supported with affirmative votes to deny Plaintiffs' application by Defendant Board Members Barta, Wetrin, Mermelstein, Meyer, Green, Honis and Prince.

211.   No other religious organization or secular project was subject to these rules, regulations, and conduct.

212.   They were permitted to present their application uninterrupted in a few short meetings, unlike what is being done to Plaintiffs.

213.   Plaintiffs have been going through this process for years with no end in sight.

214.    The Defendants have demanded that Plaintiff pay Twenty-five thousand dollars ($25,000) to have their application to be heard.

215.    This is in addition to the nearly forty thousand dollars ($40,000.00) Plaintiffs already paid the town to be heard.

216.    No other secular or religious organization has had to pay any sums to have their application heard, and no other entity has been told that if they do not pay, the application will not be considered.

217.    Indeed, huge developments in Teaneck that involved substantial development were charged less than the Plaintiffs in escrow fees.

218.    For example, 100 State Street, a 68-unit apartment complex that was being built from the ground up, was only asked to pay $53,981.76 in escrow fees. That project was approved by the in in only a few meetings despite objections from residents.

219.    Similarly, a fifteen-story mixed use building in Teaneck that contained 147 units called 189 the Plaza, was only asked to provide $45,300.00 in escrow fees. The building height is 173 feet, nearly five times the 35 feet allowed. The lot coverage for 189 The Plaza is 97%, rather than the 25% allowed by statute. The rear setback for the project is 5 feet, instead of the minimum 20 feel required. Despite the enormity of the project and the vast variances it needed, the project was only required to put $45,300 in escrow fees. This is in stark contrast to the Plaintiffs, who were not seeking to add any height, was a pre-existing building, and was seeking minor charges in which they did not require in the P zone), who were requested to pay more than double the 15 story 189 the Plaza project.

29

220.    Stunningly, 189 the Plaza was approved in just three meetings. Plaintiffs, however, were relegated to seven meetings with no end in sight until the BOA denied their application.

221.    In addition, another mega project located at 1475 Palisades in Teaneck NJ approved by the BOA was a 127-unit development that requested significant variances to complete such a development was heard and approved by the BOA in just four meetings.  In discovery, Defendant BOA claims to not know how much in escrow fees this mega project paid, but if its comparators are any indication, this mega project was asked to pay less than half of what the Plaintiffs were asked to pay.

222.    Furthermore, upon information and belief, the Church formerly at the site did not have to pay any funds for its permits or applications.

223.    Essentially, the Defendants have imposed an unlawful tax and cost upon the Plaintiffs' application.

224.    Such a tax/cost is patently unlawful, and same has not been imposed upon any Christian or Jewish centers, or upon any of the many secular projects swiftly approved by the Defendants.

225.    On October 1, 2020, Defendants denied Plaintiffs' BOA application.

226.    The individually named BOA member Defendants – Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Price, Jerry L. Barta, Edward Mulligan, Mark Mermelstein, Zev Green and James Brown – upon information and belief, all individually voted to deny Plaintiffs' application.

227.    The BOA does not exist without the action and direction from its members, and without the conduct of the individual members, the BOA would not, and could not, have taken the unlawful actions complained of herein.

228.    The BOA acted as a collective unit conspiring to impose erroneous requirements on Plaintiffs, jointly adjourned Plaintiffs' application endlessly while imposing fees on Plaintiffs in the tens of thousands of dollars for an opportunity to be heard.

229.    The BOA's denial was discriminatory, unlawful, and not based upon any legitimate reasons.

230.    The direct result of the BOA's denial was that Plaintiffs were unable to open their community center and house of worship and were unable to provide same for those in their community that sought a safe place to practice their religion and congregate.

231.    It was a continuation of the unlawful conduct complained of herein.

232.    Based on the above facts, the Defendants' actions are discriminatory in nature and are intended to prevent the Plaintiffs from permanently opening and operating its house of worship/religious education building and Islamic Center through the discriminatory application of land use regulations, in violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. 2000cc, et seq. ("RLUIPA") and the Constitutions of the United States and New Jersey.

233.    Based on the above faces, the Defendants' actions are arbitrary, capricious and unreasonable and do not serve any legitimate, rational governmental purpose under the Fourteenth Amendment to the United States Constitution.

234.    Based on the above facts, Defendants impose an unreasonable and unequal burden upon Plaintiffs.

235.    The Plaintiffs building is a "religious institution" within the meaning of 42 U.S.C. 2000cc et seq.

236.    The effect of the Defendants' actions thus far is to discriminate against the Plaintiffs based on religious affiliation and to treat the Plaintiffs on less than equal terms with a non-religious institutions, discriminated against Plaintiffs on the basis of the Islamic faith in violation of RLUIPA, as well as the New Jersey Law Against Discrimination (N.J.S.A. 10:5-1 et seq.), the New Jersey Civil Rights Act (N.J.S.A. 10:6-1 et seq.), and under the New Jersey and United States Constitutions.

237.    The effect of Defendants' conduct is to unduly restrict the Plaintiffs use and development of its land in violation of 2 U.S.C.2000cc-3(g) and 42 U.S.C. 2000cc-5(5) of RLUIPA.

238.    Defendants have acted under color of state law in failing to issue a permit and approvals to Plaintiffs with the purpose and effect of discriminating against Plaintiffs solely because of religious beliefs and/or affiliation.

239.    Defendants have denied Plaintiffs due process of law by the arbitrary manner in which it has treated Plaintiffs in refusing to consider Plaintiffs evidence in support of the issuance of a permit and/or final approval.

240.    Defendants have utilized and are utilizing their enforcement powers to threaten, intimidate, harass and coerce the Plaintiffs after they have exercised their rights under RLUIPA, as well as the New Jersey Law Against Discrimination (N.J.S.A. 10:5-1 et seq.), the New Jersey

32

Civil Rights Act (N.J.S.A. 10:6-1 et seq.), and under the New Jersey and United States Constitutions.

241.   Defendants are intentionally and maliciously harassing, intimidating and interfering with the Plaintiffs and persons associated with the Plaintiffs with the intent of preventing the Plaintiffs from opening and operating the existing religious facility.

242.   Plaintiffs cannot open nor operate an Islamic Center, that includes prayer space and other religious instruction.

243.   Nor can Plaintiffs open or operate an Islamic Center for its congregants, where its members can congregate, receive religious instruction, and have a sense of community.

244.   The activities at the Islamic Center are aimed at fostering the Islamic Community, where members can pray, work out, and enjoy religious comradery.

245.   Defendants are using land use regulations, which are inapplicable to Plaintiffs, to deny Plaintiffs their right to exercise religious practices.

246.   Defendants are purposefully applying arbitrary, erroneous, and biased purported land use and zoning regulations and rules upon Plaintiffs simply because it intends to hold religious instruction and foster an Islamic Community, despite the fact that the religious instruction and service is does not exceed the capacity of the persons permitted under the pre-approved filings.

247.   The purpose, intent, and effect of Defendants' actions is to inhibit and prohibit the exercise of religion.

248.   Defendants have used the land use regulation to prohibit Plaintiffs to occupy the Islamic Center lawfully and thrive as an Islamic Community.

33

249.    Defendants' denial of Plaintiff's permit and any necessary variances was arbitrary, capricious, unreasonable, unlawful, irrational, shocking to the conscience and done without a valid legal basis.

250.    In a recent development, on or about January 18, 2022, Defendant Township has amended its zoning laws to impose additional rules, regulations and requirements upon Plaintiffs that did not previously exist.

251.    For example, Plaintiffs were in the public "P" zone when initially applying, but they now fall under a new "community overlay" zone that was newly created following the filing and partial litigation of Plaintiffs' claims.

252.    This amendment to the zoning law is unlawful, unjust and reflects the unequal treatment of Plaintiffs and is clearly retaliatory in nature.

253.    Defendants do not proffer any reason for its new zoning rules and regulations, nor could they, as the amendments were taken to impose new barriers for Plaintiffs to adhere to in hopes of gaining tens of thousands of more dollars in fees and expenses allegedly for administrative purposes.

254.    Defendants are violating Plaintiff's civil rights in violation of 42 U.S.C. Section 1983, by their actions as set forth above, including but not limited to:

A.    acting under color of law to unlawfully deprive Plaintiff and its members of their state and federal rights to freely practice their religious beliefs, their right to religious assembly and/or their rights to equal protection and substantive due process under the New Jersey and United States Constitutions, including, without limitation, the Fourteenth Amendment to the United States Constitution; and

34

B.      acting under color of law to unlawfully interfere with Plaintiff's and its members' exercise of their state and federal rights and their right to freely practice their religious beliefs through threats, intimidation and coercion.

## COUNT I-RLUIPA-SUBSTANTIAL BURDEN

255.    Plaintiff re-allege and incorporate herein by reference all paragraphs as if alleged herein.

256.    Defendants' treatment of Plaintiffs and denial of Plaintiffs' permit, variances, and certificate of occupancy requests constitutes the imposition or implementation of a land use regulation that imposes a substantial burden on Plaintiffs' religious exercise, which burden is not in furtherance of a compelling governmental interest and/or is not the least restrictive means of furthering such interest, in violation of RLUIPA, 42 U.S.C. Section 2000cc(a)(1).

257.    In addition, even of the regulations were to apply to Plaintiffs, Defendants' application of these regulations was unequal, discriminatory, and imposed upon Plaintiffs in a way to inhibit the Islamic Center's existence, use, and functions.

## COUNT II-RLUIPA-EQUAL TERMS

258.    Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

259.    Defendants' treatment of Plaintiffs and their denial of Plaintiffs' permit, any variances, and certificate of occupancy, constitutes the imposition or implementation of a land use regulation that treated, and continues to treat, Plaintiffs on less than equal terms with a nonreligious assembly or institution, in violation of RLUIPA, 42 U.S.C. Section 2000cc(b)(1).

260.    In addition, even of the regulations were to apply to Plaintiffs, Defendants' application of these regulations was unequal, discriminatory, and imposed upon Plaintiffs in a way to inhibit the Islamic Center's existence, use, and functions.

## COUNT III-RLUIPA-DISCRIMINATION

261.    Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

262.    Defendants have treated Plaintiffs and its permit, variances, and certificate of occupancy applications differently from other such applications on the basis of religion or religious denomination, in violation of RLUIPA, 42 U.S.C Section 2000cc(b)(2).

263.    Defendants treated Plaintiffs in a hostile and negative manner in comparison to other religious institutions.

264.    In addition, even of the regulations were to apply to Plaintiffs, Defendants' application of these regulations was unequal, discriminatory, and imposed upon Plaintiffs in a way to inhibit the Islamic Center's existence, use, and functions.

## COUNT IV-NEW JERSEY LAW AGAINST DISCRIMINATION

265.    Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

266.    Defendants are violating Plaintiffs' rights under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., by its actions as set forth above, including, but not limited to:

A.    regulating land use in a manner that discriminates against Plaintiffs and their members;

36

B.      unlawfully denying and otherwise making the permits and certificate of
occupancy unavailable to the Plaintiffs and their members because of their religious creed,
beliefs, denomination and/or affiliation;

C.      illegally regulating use and certificate of occupancy requirements in a manner that
discriminates against Plaintiffs and their members on the basis of religious creed, beliefs,
denomination and/or affiliation.

267.    In addition, even of the regulations were to apply to Plaintiffs, Defendants'
application of these regulations were unequal, discriminatory, and imposed upon Plaintiffs in a
way to inhibit the Islamic Center's existence, use, and functions.

## COUNT V-NEW JERSEY CIVIL RIGHTS ACT

268.    Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged
herein.

269.    Defendants' denial of Plaintiffs' permit, variances, and certificate of occupancy
application, was arbitrary, capricious, unlawful, irrational, shocking to the conscience and done
without a valid legal basis

270.    Defendants are violating Plaintiff's civil rights in violation of the New Jersey
Civil Rights Act, N.J.S.A. 10:6-1 through 10:6-2, by their actions as set forth above, including
but not limited to:

A.      acting under color of law to unlawfully deprive Plaintiffs and their members of
their state and federal rights to freely practice their religious beliefs, their right to religious
assembly and/or their rights to equal protection and substantive due process under the New

37

Jersey and United States Constitutions, including, without limitation, the Fourteenth Amendment

to the United States Constitution; and

B.      acting under color of law to unlawfully interfere with Plaintiff's and its members'

exercise of their state and federal rights and their right to freely practice their religious beliefs

through threats, intimidation and coercion.

271.      In addition, even of the regulations were to apply to Plaintiffs, Defendants'

application of these regulations was unequal, discriminatory, and imposed upon Plaintiffs

in a way to inhibit the Islamic Center's existence, use, and functions.

### COUNT VI. VIOLATION OF THE UNITED STATES CONSTITUTION: PLAINTIFFS' DUE PROCESS RIGHTS

272.      Plaintiff re-alleges and incorporates herein by reference all paragraphs as if

alleged herein.

273.      At all relevant times, the Defendants were acting under color of law.

274.      Defendants' actions of unlawfully denying Plaintiffs permits, variances, and a

certificate of occupancy without any legitimate hearing or process.

275.      The Defendants' actions violate the Due Process clause as Plaintiffs are entitled to

a legitimate process relating to their applications.

276.      Plaintiffs were deprived of process in order to unlawfully discriminate against

them and cover up the discriminatory actions of the Defendants.

277.      In addition, even of the regulations were to apply to Plaintiffs, Defendants'

application of these regulations was unequal, discriminatory, and imposed upon Plaintiffs

in a way to inhibit the Islamic Center's existence, use, and functions.

## COUNT VII- VIOLATION OF THE UNITED STATES CONSTITUTION-FREE EXERCISE OF RELIGION: FIRST AND FOURTEENTH AMENDMENTS

278.      Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

279.      Defendants' actions as alleged herein violate Plaintiffs' right to free exercise of religion.

280.      Defendants inhibited and prohibited Plaintiffs from operating their Islamic Center.

281.      Defendants refused to permit Plaintiffs to lawfully operate the Islamic Center.

282.      Defendants denied permits and variances to the Plaintiffs despite the fact that Plaintiffs qualified for same and there were no regulations in the P Zone.

283.      Defendants have also violated Plaintiffs' rights under the Free Exercise clause by imposing a substantial burden upon the exercise of Plaintiffs' religion.

284.      The substantial burden has been imposed by the discriminatory and arbitrary refusal to grant permit, imposition of inapplicable requirements upon them, and taxing them unlawfully.

285.      Defendants have unreasonably placed burdens upon the Plaintiffs, violating the Plaintiffs' Constitutional Rights.

286.      Defendants have treated Plaintiffs unequally and in a disparate manner in relation to other secular organizations and religious institutions.

287.      Defendants have not afforded Plaintiffs equal treatment or protection.

288.      Defendants also rezoned the property while this litigation is pending to imposed additional, previously not required requirements upon Plaintiffs.

289.     Indeed, the rezoning of the Plaintiffs' property both concedes that no previous regulation applied and at all times Defendants' actions were discriminatory and aimed at unlawfully inhibiting the Plaintiffs' rights under RLUIPA, the NJCRA, by imposing requirements that did not exist, and the constitution, as well as other rights, and that the Defendants sought to retaliate against the Plaintiffs for filing this action and pursuing their claims.

290.     Defendants wasted more than two years of Plaintiffs' time and millions of resources by giving them the run around in the Township permitting process then the BOA, all the while the Defendants could have rezoned the property and or simply granted the Plaintiffs the permits they sought and/or the variances that Plaintiffs were entitled to.

291.     The impediments, disparate treatment and impact, and burdens placed upon Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

## COUNT VIII-VIOLATION OF THE NEW JERSEY CONSTITUTION-FREE EXERCISE OF RELIGION

292.     Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

293.     Article I, Paragraph 3 of the New Jersey Constitution guarantees the free exercise of religion.

294.     Defendants' actions as alleged herein violate Plaintiffs' right to free exercise of religion.

295.     Defendants have violated Plaintiffs' rights under the Free Exercise clause by imposing a substantial burden upon the exercise of Plaintiffs' religion.

296.     Defendants also rezoned the property while this litigation is pending to imposed

additional, previously not required requirements upon Plaintiffs.

297.     Indeed, the rezoning of the Plaintiffs' property both concedes that no previous

regulation applied and at all times Defendants' actions were discriminatory and aimed at

unlawfully inhibiting the Plaintiffs' rights under RLUIPA, the NJCRA, by imposing

requirements that did not exist, and the constitution, as well as other rights, and that the

Defendants sought to retaliate against the Plaintiffs for filing this action and pursuing

their claims.

298.     Defendants wasted more than two years of Plaintiffs' time and millions of

resources by giving them the run around in the Township permitting process then the

BOA, all the while the Defendants could have rezoned the property and or simply granted

the Plaintiffs the permits they sought and/or the variances that Plaintiffs were entitled to.

299.     The impediments, disparate treatment and impact, and burdens placed upon

Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

300.     The substantial burden has been imposed by the discriminatory and arbitrary

revocation of Plaintiffs' permit, imposition of inapplicable requirements upon them, and

taxing them unlawfully.

## COUNT IX-VIOLATION OF THE UNITED STATES CONSTITUTION FOURTEENTH AMENDMENT-EQUAL PROTECTION

301.     Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged

herein.

302.    The Defendants' conduct as described herein violated and continue to violate Plaintiffs' rights under the Equal Protection Clause by intentionally treating Plaintiffs' differently from other entities on the basis of religious belief.

303.    Defendants also rezoned the property while this litigation is pending to imposed additional, previously not required requirements upon Plaintiffs.

304.    Indeed, the rezoning of the Plaintiffs' property both concedes that no previous regulation applied and at all times Defendants' actions were discriminatory and aimed at unlawfully inhibiting the Plaintiffs' rights under RLUIPA, the NJCRA, by imposing requirements that did not exist, and the constitution, as well as other rights, and that the Defendants sought to retaliate against the Plaintiffs for filing this action and pursuing their claims.

305.    Defendants wasted more than two years of Plaintiffs' time and millions of resources by giving them the run around in the Township permitting process then the BOA, all the while the Defendants could have rezoned the property and or simply granted the Plaintiffs the permits they sought and/or the variances that Plaintiffs were entitled to.

306.    The impediments, disparate treatment and impact, and burdens placed upon Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

307.    Defendants' unlawful conduct includes, but is not limited to, treating Plaintiffs differently in the permitting process, variance process, and certificate of occupancy, unilaterally refusing to issue permits that should have immediately been issues, and taxing them despite their tax-exempt status.

42

## COUNT X- VIOLATION OF THE NEW JERSEY CONSTITUTION-EQUAL PROTECTION

308.     Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

309.     The Defendants' conduct as described herein violated and continue to violate Plaintiffs' rights under the Equal Protection Clause, Article I, Paragraphs 1 and 5, by intentionally treating Plaintiffs differently from other entities on the basis of religious belief.

310.     Defendants also rezoned the property while this litigation is pending to imposed additional, previously not required requirements upon Plaintiffs.

311.     Indeed, the rezoning of the Plaintiffs' property both concedes that no previous regulation applied and at all times Defendants' actions were discriminatory and aimed at unlawfully inhibiting the Plaintiffs' rights under RLUIPA, the NJCRA, by imposing requirements that did not exist, and the constitution, as well as other rights, and that the Defendants sought to retaliate against the Plaintiffs for filing this action and pursuing their claims.

312.     Defendants wasted more than two years of Plaintiffs' time and millions of resources by giving them the run around in the Township permitting process then the BOA, all the while the Defendants could have rezoned the property and or simply granted the Plaintiffs the permits they sought and/or the variances that Plaintiffs were entitled to.

313.     The impediments, disparate treatment and impact, and burdens placed upon Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

43

314.     Defendants' unlawful conduct includes, but is not limited to, treating Plaintiffs

differently in the permitting and variance process, refusal to provide a certificate of

occupancy, unilaterally revoking their permits, and taxing them despite their tax exempt

status.

## COUNT XI- NEW JERSEY MUNICPAL LAND USE LAW

315.     Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged

herein.

316.     Defendants also rezoned the property while this litigation is pending to imposed

additional, previously not required requirements upon Plaintiffs.

317.     Indeed, the rezoning of the Plaintiffs' property both concedes that no previous

regulation applied and at all times Defendants' actions were discriminatory and aimed at

unlawfully inhibiting the Plaintiffs' rights under RLUIPA, the NJCRA, by imposing

requirements that did not exist, and the constitution, as well as other rights, and that the

Defendants sought to retaliate against the Plaintiffs for filing this action and pursuing

their claims.

318.     Defendants wasted more than two years of Plaintiffs' time and millions of

resources by giving them the run around in the Township permitting process then the

BOA, all the while the Defendants could have rezoned the property and or simply granted

the Plaintiffs the permits they sought and/or the variances that Plaintiffs were entitled to.

319.     The impediments, disparate treatment and impact, and burdens placed upon

Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

44

320.    N.J.S.A. Section 40:55 D-1 and New Jersey common law prohibit a municipality

from exercising its land use powers in a manner that is arbitrary, capricious, or

unreasonable, and not supported by substantial evidence.

321.    Defendants have acted in an arbitrary, capricious, and unreasonable manner.

322.    Defendants' actions violate NJSA Section 40:55.

## COUNT XII- NEW JERSEY MUNICPAL LAND USE LAW

323.    Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged

herein.

324.    Defendants' actions of imposing costs and fees in the tens of thousands of dollars

constitute an unlawful tax, substantial burden, and other unlawful restriction upon

Plaintiffs.

325.    Defendants also rezoned the property while this litigation is pending to imposed

additional, previously not required requirements upon Plaintiffs.

326.    Indeed, the rezoning of the Plaintiffs' property both concedes that no previous

regulation applied and at all times Defendants' actions were discriminatory and aimed at

unlawfully inhibiting the Plaintiffs' rights under RLUIPA, the NJCRA, by imposing

requirements that did not exist, and the constitution, as well as other rights, and that the

Defendants sought to retaliate against the Plaintiffs for filing this action and pursuing

their claims.

327.    Defendants wasted more than two years of Plaintiffs' time and millions of

resources by giving them the run around in the Township permitting process then the

BOA, all the while the Defendants could have rezoned the property and or simply granted

the Plaintiffs the permits they sought and/or the variances that Plaintiffs were entitled to.

328.      The impediments, disparate treatment and impact, and burdens placed upon

Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

329.      Defendants' imposition of these astronomical fees and costs are unlawful.

330.      Defendants' imposition of these costs and fees violate Plaintiffs' Federal and

State Rights, including but not limited to, under RLUIPA, the Constitutions of the United

States and the State of New Jersey, and the New Jersey Civil Rights Act.

## COUNT XIII-AIDING AND ABBETTING

331.      Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged
herein.

332.      Defendants aided and abetted each other in the unlawful discrimination as

discussed herein.

333.      Each Defendant participated in discriminating against Plaintiffs throughout the

zoning and planning matters.

334.      Defendants imposed discriminatory rules and regulations, discriminatorily applied

zoning and permit laws, and sought to unlawfully inhibit the use of the Islamic center.

335.      Each Defendant acted in concert with each other and others to perpetuate the

conduct complained of herein.

Count

336.      Defendants' actions violated Federal and State law, including but not limited to

NJLAD, NJCRA, and the Constitutions.

337.     Defendants also rezoned the property while this litigation is pending to imposed additional, previously not required requirements upon Plaintiffs.

338.     Indeed, the rezoning of the Plaintiffs' property both concedes that no previous regulation applied and at all times Defendants' actions were discriminatory and aimed at unlawfully inhibiting the Plaintiffs' rights under RLUIPA, the NJCRA, by imposing requirements that did not exist, and the constitution, as well as other rights, and that the Defendants sought to retaliate against the Plaintiffs for filing this action and pursuing their claims.

339.     Defendants wasted more than two years of Plaintiffs' time and millions of resources by giving them the run around in the Township permitting process then the BOA, all the while the Defendants could have rezoned the property and or simply granted the Plaintiffs the permits they sought and/or the variances that Plaintiffs were entitled to.

340.     The impediments, disparate treatment and impact, and burdens placed upon Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

**COUNT XIV-RETALIATION-UNLAWFUL REZONING OF SUBJECT PROPERTY**

341.     Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

342.     During the pendency of this matter, Teaneck's City Council, aided and abetted by the individual Defendant Melfi, rezoned the Plaintiffs' property to impose requirements upon their property that did not otherwise exist.

47

343.    In an apparent concession that there were no restrictions in the P zone as Plaintiffs have long stated, the Defendants rezoned the property to impose various previously inapplicable requirements, including for lot coverage and other zoning rules.

344.    Defendants' actions were retaliatory, violated the Plaintiffs' First and Fourteenth Amendment rights, as well Plaintiffs' RLUIPA, NJCRA, and other rights.

345.    Defendant Teaneck's actions are perpetrated by its Town Council, the Townships chief policy makers, and thus makes the Teaneck liable under *Monell* as well.

346.    But for the Plaintiffs asserting this lawsuit, the Township would not have rezoned the property to impose the requirements that did not otherwise exist.

347.    Furthermore, no other secular or religious entity were subject to a rezoning simply because they sought to vindicate their rights.

## **RELIEF SOUGHT AS TO ALL COUNTS**

**WHEREFORE**, Plaintiff prays that the Court enter an order that:

A.    Declaratory Judgment and Order that the Defendants' continued denial of Plaintiffs permit, variance, and certificate of occupancy, and the refusal to provide same, as alleged herein, violate their Rights, RLUIPA and their Constitutional Rights;

B.    Declaratory Judgment and Order that the Defendants' that the Defendants' continued denial of Plaintiffs' permit, variance, and certificate of occupancy, and the rescinding of Plaintiffs' previously approve permit and certificate of occupancy, as alleged herein, is arbitrary, capricious, unreasonable and without a valid governmental purpose;

C.      Enjoining the Defendants and all other persons in concert or participation with Defendants, from refusing to issue all necessary permits, variances, and approvals for Plaintiffs and certificate of occupancy by:

1.      Imposing a substantial burden on the religious exercise of Plaintiffs and their members that is not narrowly tailored to further a compelling governmental interest;

2.      Treating Plaintiffs and their members on less than equal terms with nonreligious assemblies or institutions;

3.      Discriminating against Plaintiffs and its members on the basis of religion or religious denomination;

D.      Enter a temporary restraining order and/or preliminary and permanent injunctions enjoining the Defendants, as well as all other officers, employees, agents and attorneys of the City of Teaneck, and all persons in active concert or participating with any of them, from interfering with the operation of Plaintiffs house of worship and religious facility;

E.      Enter a temporary restraining order and/or preliminary and permanent injunctions enjoining the Defendants, as well as all other officers, employees, agents and attorneys of the City of Teaneck, and all persons in active concert or participating with any of them from unlawfully denying, and/or withholding Plaintiffs' permit or any other permit or regulation for the operation of its house of worship and religious facility,

F. Granting Plaintiffs all approvals sought in their applications to Defendants;

G. Grant an award of reasonable costs and attorneys' fees;

H.      Grant an award of compensatory and punitive damages pursuant to RLUIPA, 42 U.S.C. Section 2000cc et seq., 42 USC 1983, the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 et sq.; and,

I.      Appointment of a federal monitor to oversee Defendants' implementation and compliance with this Court's remedial powers, as well as Defendants continuing compliance with federal law for a period of time determined by the Court;

J.      Declaratory Judgment and Order that the existing plans and all other land use regulations are proper, satisfied and complied with, such that a final Certificate of Occupancy may be issued forthwith.

K.      Declaratory Judgment and Order that the actions described above and applications are unlawful and in violation of the Constitutions of the Unites States and New Jersey:

L.      Declaratory Judgment and Order that Plaintiffs does not have to pay any of the costs and fees demanded by Defendants;

M.      Punitive damages against the individual Defendants where permitted by law;

N.      Order other such other relief as the Court deems just and proper.

O.      Granting Plaintiffs the right to open and operate the Islamic Center pursuant to their plans and modifications;

P.      All other remedies and rights afforded under the law and the Court deems just and proper.

Dated: March 29, 2022

Respectfully submitted,

s/Aymen A. Aboushi
Aymen A. Aboushi, Esq.

The Aboushi Law Firm
1441 Broadway, 5th Floor
New York, NY 10018
Tel: 212.391.8500
Fax: 212.391.8508
Email: Aymen@Aboushi.com
www.Aboushi.com


s/ Joel S. Silberman
Joel S. Silberman, Esq.
Law Offices of Joel Silberman
549 Summit Avenue
Jersey City, NJ 07306
Tel. (201) 420-1913
Fax (201) 420-1914
Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), the Plaintiff demands a trial by jury of all issues so triable as of right.

**CERTIFICATION**

In accordance with Local Civil Rule 11.2, I hereby certify that this matter is not the subject of any other action pending in any court, or of any pending arbitration, or administrative proceeding.  In accordance with Local Civil Rule 201.1(d)(1) & (2)(A), I certify that this matter is not subject to compulsory arbitration or to mediation because this action is based on an alleged violation of a right secured by the Constitution of the United States, and because the relief sought includes money damages in excess of $150,000, exclusive of interest and costs, and any claim for punitive damages, in addition to declaratory and injunctive relief.

s/Aymen A. Aboushi
Aymen A. Aboushi, Esq.
The Aboushi Law Firm

51