UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| AL UMMAH COMMUNITY CENTER, AKA, AUCC FAMILY, EDUCATION AND FAITH CENTER, a New Jersey Non-Profit Corporation, RAY OF SUNSHINE FOUNDATION INC., a New Jersey Non-Profit Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> TEANECK, TEANECK ZONING BOARD OF ADJUSTMENT, and its Members, JAN MEYER, HARVEY ROSEN, DANIEL WETRIN, MONICA HONIS, JENNIFER PRINCE, JERRY L. BARTA, EDWARD MULLIGAN, ATIF REHMAN, MARK MERMELSTEIN, ZEV GREEN, JAMES BROWN, in their individual and official capacities, DAN MELFI, individually and in his official capacity, ADAM MYSZKA, individually and in his official capacity, and JOHN AND JANE DOES 1-20, in their individual and official capacities, <br><br> Defendants. | **SECOND AMENDED COMPLAINT** <br><br> Civil Action No.: 2:20-cv-14181 (KM)(ESK) |

## **INTRODUCTION**

This case is about religious liberties and the discriminatory and unequal practices of Teaneck, its employees, and its Zoning Board of Adjustments.  Plaintiffs are New Jersey religious not for profit, 501(c)(3) charitable corporations with offices in Teaneck, New Jersey. They simply seek to build an Islamic Center that contains amenities for its members, just as other religious and secular organizations in Teaneck have done for years. Despite years and thousands

of dollars spent to appease the Defendants' unlawful and discriminatory requirements,

Defendants continue to act in violation of the Constitutions of the United States and New Jersey,

as well as the Federal law explicitly prohibiting religious discrimination by discriminating

against the Plaintiffs and imposing an unlawful burden on the practice of their faith.  The facts

uncovered in this matter reveals a stunning direct and constant course of discriminatory conduct

aimed at frustrating, delaying, and ultimately denying the Islamic Center's existence because it

was an Islamic organization. Some of the damning evidence revealed thus far is the following

testimony from a BOA member who had a front row seat to the unlawful conduct:

"A: So to my left was a board member named Edward Mulligan. During the [Plaintiffs'] application, there was one part of the application where we were talking about traffic flow, and how pickups and drop-offs would work. And during the course of the testimony, you know, a question was asked about, you know, how the pickups would work, and the person who was answering the question asked clarification, are you talking about cars, or busses, right. They were asking for clarification. And [ZBA Member] Edward Mulligan who sits next to me, under his breath, kind of to himself said, **OR CAMELS.**"

"A: [W]e were kind of talking to each other about the application, whispering because the application was going on. And I made a point and I said, it's already approved for the school, like it's already approved for the daycare. And he said, that was a _**SCAM**_. Would you trust _**THESE PEOPLE**_ with your children?"

"A: I felt that [Board of Adjustment Chairman] Jan Meyer was just clearly dragging this [application] on for what I thought should have been at this point a done deal. And after that application was -- after that hearing was done, there was a lot of, like questioning in that -- a lot of questions that were asked from Jan which I thought were ridiculous frankly."

"A: What I found troubling as a board member, was throughout the application Jan Meyer made a point to distinguish between applicant and the applicant's attorney. So, you know, Mr. Ferraro, who was the applicant's attorney, he kept saying, implying Mr. Ferraro, you're a good lawyer, like, you know, the application and again, I don't know the exact wording, but the implication was Mr. Ferraro, you're a good lawyer but your client is difficult, your client is problematic. I had not seen that before. You know, the applicant is the applicant. And you're not distinguishing between, you know, lawyer versus applicant. I found that as something that was, to me troubling. I think Jan, again, throughout the application implied that there was something suspicious, underhanded about the applicant. So for example, and again, I encourage you to go back through

all of the transcript, but if my memory serves me correctly, there was a point about -- he pointed out that, you know, the applicant is going from point A to point B in a roundabout way. Right, again, implying -- the application to me was, and keep in mind the board takes their cue, their cue, see, from the chair, right? So there was an implication that there was something odd about this application, something shady about this application. Two more instances that come to mind. One was when he was questioning the architect about the number of bathrooms. And the architect just wasn't sure, you know. Jan made some comment, like doesn't anybody know about what's going on in this application. Like, just implying that, again, there was something that was being kept. And earlier in the application there was this awkward exchange between Mr. Ferraro and Jan where Jan made some comment, like again paraphrasing, you know, but implying, like oh, you don't know what's coming. And Mr. Ferraro, was, like kind of looking at the rest of the board, like, okay, can you elaborate. Can you give me, like some indication so, like so -- again, it was an odd exchange. And I remember the look on Mr. Ferraro's face, like looking at the rest of the board for kind of, can you give me some kind of context when you're saying, you don't know what's coming.

Q: And did you understand that comment to mean for shadowing sort of Jan Meyer's hard time that he was intent on giving this applicant?
A: Yeah."

These astonishing and devastating facts peal back the veneer of legitimacy the Defendants' actions in this matter seek to project in relation to the discrimination and other unlawful conduct the Defendants visited upon the Plaintiffs. Since 2018, Plaintiffs have sought to establish the Al Ummah Islamic Center in the Township of Teaneck. Defendants have used the zoning process to unlawfully deny Plaintiffs the right to operate their Islamic Center for years, including forcing Plaintiffs to partake in their Zoning Board of Adjustments process despite being under no obligation to do so, unlawfully delaying applications, imposing onerous standards, and demanding tens of thousands of dollars in fees. Furthermore, Defendants, in yet another attempt to evade responsibility for their conduct, have passed an ordinance that they claim renders Plaintiffs' claims moot, but instead impose additional retaliatory restrictions on Plaintiffs that, by design, does not affect any other religious or secular entities. Defendants' unlawful conduct must end and they must be held accountable.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§§ Sections 1331, 1343(a)(4), 42 U.S.C. §2000cc et seq. ("RLUIPA"), The Equal Protection Clause of the 14th Amendment to the United States Constitution; and 42 U.S.C. § 1983, which provides redress for the deprivation, under color of state law, of rights, privileges and immunities secured to all citizens and persons within the jurisdiction of the United States by the Constitution and laws of the United States.

2.     Venue is proper in the United States District Court for the District of New Jersey under 28 U.S.C. Section 1391(b) as all acts complained of occurred within this District.

3.     Plaintiff seeks declaratory and injunctive relief against the Defendants pursuant to 28 U.S.C. §§ 2201 and 2202 and injunctive relief pursuant to 42 U.S.C. § 3613(c)(1).

4.     In addition, 28 U.S.C. § 1367 confers supplemental jurisdiction on this Court over Plaintiff's related state law claims.

## PARTIES

5.     Plaintiffs are a New Jersey, not for profit, 501(c)(3) tax exempt Religious Corporations.  Their principal place of business is in Teaneck, NJ.

6.     Plaintiffs are Islamic based organizations, whose mission includes operating an Islamic Center for its members to have religious services, congregations, prayers, as well as other amenities and recreational activities. They sought to open an Islamic center that is a Religious Facility that would provide fellowship, instruction Islamic-compliant recreational facilities, and support, encourage, and spread the ideals and sense community of Islam.

4

7.     The Township of Teaneck ("Teaneck") is a municipal corporation and organized under the law of the State of New Jersey, located in Teaneck, NJ.

8.     Defendant Teaneck Zoning Board of Adjustment ("BOA") is an entity/arm of Defendant Teaneck and acts on its behalf with regards to real property permits, zoning, and applications.

9.     Defendants Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown are employed by Defendant Teaneck, and or acting on its behalf, by way of the Teaneck Zoning Board of Adjustments. They are named herein in their individual and official capacities and are collectively referred to herein with the Board of Adjustments as "BOA."

10.    Defendant Dan Melfi is a senior zoning officer employed by Defendant Teaneck and holds considerable sway and input regarding permits, approvals, and variances. He is named herein in his individual and official capacity.

11.    Defendant Melfi is the highest authority regarding permits for the Township and his denial is the final decision for the Township – a denial from Melfi means an applicant must then go before the Board of Adjustments.

12.    Defendant Adam Myszka is an official that is employed by Defendant Teaneck and issues summons on behalf of the Township.

13.    Defendants John and Jane Does 1-20 are fictitious parties who are presently unknown who may have knowledge of or involvement with the underlying facts and events in this action and participated in the unlawful conduct as alleged herein. They are named individually and in their official capacities.

14. Each of the Defendants participated in the conduct complained of herein personally and directly.

## STATEMENT OF FACTS

15. The subject property is located at 50 Oakdene Ave, Teaneck, NJ 07666 ("Site" or "Property")

16. The Site sits on more than 2.25 acres and has a stand-alone parking lot.

17. The Site sits on a corner, with three street exposures and one property line adjacent to the end of the site, next to the parking lot.

18. The Site is a two-story building and was a former public school. The school was decommissioned and sold to a Church.

19. The Church used the Site for religious purposes, including congregation, instruction, recreation, and gatherings.

20. The in addition to religious instruction, the former Church also used the Site for schooling and other activities, including recreation, community events, and religious celebrations. These are identical uses that Plaintiffs sought for the Islamic Center.

21. Upon information and belief, in construing the Church's application to operate Defendant Teaneck/BOA permitted the Church to rely upon street parking in the parking calculation.

22. Moreover, the Church was granted direct approval, without going through the Board of Adjustments for various items denied to the Plaintiffs including a for a ramp to permit wheelchair access to the property.

23. After years of occupancy, the Church sold the Site to Plaintiffs.

## UNLAWFUL AND DISCRIMINATORY CONDUCT BY TEANECK, MELFI, AND MSYZKA BEFORE THE BOA APPLICATION

24.     The Plaintiffs sought various approvals to the Site to turn it into an Islamic Center with recreational activities for men and women (and providing separate rooms and areas for men and women where religiously appropriate), opportunities to congregate, for fellowship, opportunities to study Islam, and for similar uses as the previous Church, that included a daycare.

25.     At the onset of the project, Plaintiffs were unequivocally clear that they intended to open a religious house of worship, including but not limited to, including that it's an Islamic-based Faith Center in its official name and disclosing their intent to use the Site as a house of worship on its application. The Islamic Center would also permit the execution of Islamic Principles, including having teaching Islam and having classes regarding Islam, forging fellowship between Muslims who come and use the Islamic Center, and having Islamic-compliant separated activities for boys and girls.

26.     Without just cause, the daycare application was unlawfully delayed, which resulted in Plaintiffs' inability to open the daycare on time to accept students by Defendants Teaneck, Melfi, Myszka.

27.     The Plaintiffs met with Teaneck Officials, including Defendant Melfi, the senior and sole zoning officer in Teaneck, and reviewed the proposed plans and uses for the Site.

28.     Plaintiffs were questioned significantly regarding the proposed Islamic Center, its religious use, even questioning the name, which simply means community in Arabic.

29.     Plaintiffs were urged by Defendant Melfi and other Township officials to use an acronym for the Center, rather than the full name, because the full name in Arabic might cause problems for the project.

30.     Plaintiffs relied on Defendant Melfi's guidance because Defendant Melfi was the ultimate decisionmaker and he possessed final authority in the approval of zoning related applications for Teaneck as their senior and sole zoning officer.

31.     The Plaintiffs were encouraged by Defendant Melfi and other officials to minimize the fact that it would be an Islamic Center to "fly under the radar" and not incur the ire of the Teaneck and its residents and officials, including the Board of Adjustment and its members.

32.     Despite no obligation to do so, Plaintiffs continually met with town officials since 2018 on several occasions, each time changing their plans at the behest of Teaneck officials in order to ensure swift and seamless approvals.

33.     This included limiting the prayer space, and other religious activities at the Site.

34.     Defendant Melfi, in his official capacity as the senior zoning official of Teaneck, made several representations to the Plaintiffs, including that the revisions were acceptable and that the Plaintiffs would receive swift approvals.

35.     Plaintiffs changed the nature and character of the Center to appease town officials, including downplaying the Islamic Nature of the center, and minimizing the prayer space aspect of their house of worship.

36.     Given the generous space at the Site, Plaintiffs were urged by the Town to add a pool so that Teaneck's swimming clubs and high school could use it to practice and compete.

37.     It was relayed to Plaintiffs that Teaneck did not have a pool for its swim team and adding one would be a huge asset for the Town as well as a place the high school swim team could practice.

38.     Plaintiffs reluctantly obliged Defendants, and at considerable cost and expense, added the pool and pool house to the plans for use by its members and the Teaneck High School.

39.     The Pool would also accommodate the members of the Islamic Center, as men and women would be able to swim separately, at different times, in accordance with Islamic traditions.

40.     Plaintiffs presented the plans to the Defendants before a formal submission was made to the permit office, and the Defendants, including Defendant Melfi, assured Plaintiffs that the plans would be approved without any issues.

41.     Despite these approvals, Defendant Melfi and the Township rejected the Islamic Center's plans, unnecessarily necessitating the Plaintiffs to go before the BOA for approvals. This process would be expensive and time-consuming and would place Plaintiffs at the mercy of the BOA and its members.

42.     The pre-approved plans did not contain any significant changes or uses and complied with the existing zoning laws.

43.     Indeed, amongst other items, there was the request in the plans for an American with Disabilities Act ("ADA") compliant ramp, an ADA-complaint elevator, minor parking adjustments, minor adjustments to the heights for fence and retaining wall, the town-proposed pool, a roundabout driveway so children can be dropped off and picked up easily, and minor increase in lot coverage.

44.     Additionally, the Site was in the Public Zoning area, and by statute, the Islamic Center, its recreational facilities, and associated uses were per se permitted.

45.     No variance or appeal to the BOA was required and the permit should have been granted outright.

46.     According to Teaneck's zoning statutes, the Public Zone, in which the Site is located, did at the time not have any conditional uses, dimensional, density and other bulk restrictions, or any other provisions and requirements.

47.     As laid out herein, the outright rejection of the Plaintiffs' application for a permit violated the explicit terms of the P Zone.

48.      This was a discriminatory act by Teaneck and Melfi that unequally applied the zoning laws and permit applications.

49.     Plaintiffs submitted their pre-approved plans, which then became subject to public backlash at the proposed Islamic Center.

50.      Much to the shock of Plaintiffs, the pre-approved plans were swiftly rejected by Defendants Melfi and Teaneck, who used pretextual reasons to deny the permit application. Indeed, the reasons stated for the denial related to requirements that did not apply to the Site and have never been applied to the Site.

51.     Defendants then undertook a course of conduct in which they engaged in further conduct to obstruct the project, as well as discriminate against Plaintiffs.

52.     Defendant Teaneck, through its highest zoning policy maker, Defendant Melfi, denied Plaintiffs' request for work permits on several occasions, the first of which occurred on or about August 29, 2019.

10

53.     The denial cited the alleged lack of a proposed site plan and zoning chart with calculations as the basis for the denial of the ADA ramp, citing Municipal Zoning Ordinance Section 33-23(d)(3)(a).

54.     A plain review of the cited provision reveals that it is only applicable where there is a commencement of a use, or change of use, or the erection, construction, reconstruction, alteration, conversion or installation of a structure or building, which is clearly inapplicable to Plaintiffs' application.

55.     Despite the foregoing, Plaintiffs amended their application and resubmitted its request for the work permit.

56.     Defendant Teaneck, by and through their highest zoning policy maker Defendant Dan Melfi, denied Plaintiffs' requests again on or about September 10, 2019.

57.     The denials stated that zoning board approval was required, and that the permits may not be issued on properties with outstanding violations.

58.     Teaneck and Melfi's denial of the permit for the ADA ramp claimed that site plans were not submitted, when in fact the Plaintiffs did submit a site plan.

59.     Further, Defendants cited the same code provision in granting the Church's request for a ramp that they used to deny the ramp application for Plaintiffs.

60.     In granting the permit for the Church's ramp, Defendants cited Zoning Ordinance Article V, Section 33-23(d)(3)a, and stated that the ramp was permitted as a right.

61.     Stunningly, the Defendants used the very same Ordinance to deny the Plaintiffs' application for the same ramp.

11

62.     In fact, unlike what they did to the Plaintiffs, the Defendants did not require the Church to obtain variances from the BOA.  The application was granted outright.

63.     The permit for the Church's ramp was granted a mere two days after the Church submitted the request. In contrast, more than two years after starting the process, the Defendants still have not approved the ADA ramp.

64.     Teaneck and Melfi refused to permit Plaintiff to maintain the exact same prayer space.

65.     Despite the fact that Plaintiff in no way changed the size of the prayer space that the church had used, the Defendants refused to permit Plaintiff to utilize the same space for a mosque and Islamic Center.

66.     Defendants refused to provide even a temporary certificate of occupancy so that the prayer space and Islamic Center may lawfully be used.

67.     Defendants have given temporary certificates of occupancy to other secular institutions and religious facilities but refuse to do same for the Islamic Center.

68.     As a direct result of Defendants' denial to issue even a temporary certificate of occupancy, Plaintiffs have been denied an opportunity to lawfully open their Islamic Center at any capacity. Plaintiffs are unable to serve their community, even at a minimal capacity, nor are they able to provide any space for religious activities, including but not limited to, fellowship, use of recreational facilities (including Islamic-compliant ones that are separate for men and women), and congregating.

69.     Despite passing all inspections and uses inside the Islamic Center, Teaneck and Melfi refuse to temporarily permit them to use it as they have permitted other religious and secular entities to do.

70.     What is more, the Plaintiffs' use of the Site will no doubt produce less traffic, people, and interruption to the neighborhood than its previous use as a public school.

71.     As much was recognized by Teaneck when it granted the Church variances and permits that it refused to grant Plaintiffs.

72.     Yet, as with many other facets of the Plaintiffs' application, Defendants Teaneck and Melfi imposed a double standard, refused to provide the Plaintiffs with the same permits and variances it once gave to a Church at the same Site, and treated the Plaintiffs more stringently than secular and other religious buildings and developments. Plaintiffs should not have been subjected to the zoning board process because, based on Defendants' own zoning statutes, the Site was located in the Public Lands Zone, which does not require Zoning Board approval.

73.     Furthermore, the alleged violations barring the issuance of the permits were nonexistent, and the only violations associated with the site were issued after Defendant Teaneck's denials, and only served as additional false pretenses to deny Plaintiffs' application.

74.     In fact, there were no violations on the site – Defendants sought to cover their tracks by writing violations afterwards to justify the denial.

75.     Upon information and belief, Defendant Adam Myszka collaborated with Defendants Teaneck and Melfi to cover their tracks by issuing frivolous violations and manufactured a reason to deny Plaintiffs' permit applications.

13

76.     Adam Myszka took direct action as well as aided and abetted the Defendants by writing frivolous summonses so that the Defendants would have yet another, false, reason to deny Plaintiff's request for a permit.

77.     Upon information and belief, Defendant Myszka and Melfi collaborated so that Defendant Myszka would issue summons to the Plaintiffs for infractions AFTER Plaintiffs applied for permits so that there was a manufactured and false basis to refuse Plaintiff permits.

78.     Defendants Teaneck and Melfi refused to approve Plaintiffs' application to modify an existing fence, then proceeded to collaborate with Defendant Myszka to issue a violation for the very same fence. They imposed requirements that were improper and patently irrelevant. They went out of their way to find ways to deny Plaintiffs' application, including misconstruing the height of a fence that sat upon a retaining wall in order to claim that the height of the fence was over the limit. This was patently untrue and Defendant Teaneck and Melfi's calculations were reverse engineered and novel applications solely to deny the simple fence permit.

79.     Defendants Teaneck and Melfi continued their discriminatory conduct with additional denials of work permits, including but not limited to refusals dated October 2, 2019, and November 25, 2019, wherein the basis of their denials remains unclear because they cited a number of municipal zoning ordinance sections that do not apply to Plaintiffs.

80.     Defendants Teaneck and Melfi denied the permit request by falsely claiming that recreational facilities were not permitted in the P zone.   In fact, recreational facilities are permitted in the P zone as per statute. Teaneck Code 33-24.23. As such, Plaintiffs' recreation use should have been permitted as a matter of law in accordance with the zoning law.

14

81.     Defendants Teaneck and Melfi undermined his own denial by admitting in the denial document that, even as a community center, there are no use criteria for a community center. Yet Defendants Teaneck and Melfi continued to impose use and other inapplicable criteria upon Plaintiffs.

82.     Furthermore, given the prior use of the religious facility by the church that had a school, church, daycare, and community events, and the permissible recreational uses, the use of the Site as a community space for further worship and fellowship should have been approved as an ancillary use.

83.     Defendants Teaneck and Melfi had at least three grounds to grant the permit applications, but instead went of their way to manufacture inapplicable standard, impose them upon Plaintiff, and then deny the permit applications on that basis.

84.     Even though Plaintiffs' application was pre-approved and did not require zoning board approval, Defendants proceeded to reject all of the pre-approved proposals and required Plaintiffs to go before the Defendant BOA.

85.     This unfair and disparate treatment continued before the BOA, where Defendant Melfi continued to perpetuate his unlawful conduct in concert with Defendant BOA and its Members.

86.     The foregoing conduct by Defendants Teaneck, Melfi, and Myszak were based in discrimination against the Islamic Center.

## UNLAWFUL CONDUCT AT THE BOARD OF ADJUSTMENT BY DEFENDANTS MELFI, BOARD OF ADJUSTMENT, JAN MEYER, HARVEY ROSEN, DANIEL WETRIN, MONICA HONIS, JENNIFER PRINCE, JERRY L. BARTA, EDWARD MULLIGAN, ATIF REHMAN, MARK MERMELSTEIN, ZEV GREEN, AND JAMES BROWN

87.     Despite having no obligation to do so, and in an effort of appeasement, Plaintiffs applied to the BOA as instructed.

88.     Testimony in this matter has established that from the inception of the matter, Defendant BOA and its members knew Plaintiffs were Muslim because 1. The representatives and supporters of the Plaintiffs who appeared at every meeting dressed in Islamic garb, 2. The application stated it was a religious facility, and 3. The testimony stated that the applicants were Muslim.

89.     The BOA process was a sham aimed at delaying and denying the application and bleeding Plaintiffs, a non-profit, of precious funds. Almost immediately, the BOA process was exposed as a farce.

90.     The Islamic Center became a point of contention where both the public and the BOA, including its members, obstructed, frustrated, and delayed Plaintiffs' application because they did not want the Islamic Center to operate.

91.     The individually named Defendants acted as a collective unit to prevent Plaintiffs from opening their house of worship and provide a space for members of their community who wished to pray and exercise their religion at the Islamic Center.

92.     Each of the individually named Defendants acted in unison with the collective purpose to sabotage Plaintiffs' application in accord with Defendants Teaneck, Melfi and Myszka's prior actions in order to prevent the Islamic Center from ever opening.

16

93.     The BOA held several public hearings wherein members of the public were allowed to ask Plaintiffs questions about their proposal. Defendant Rosen, who at times chaired the meetings, encouraged members of the public to continue asking questions without limit or care for how long the questioning went on for, or whether or not the questions posed were duplicative and therefore a waste of time.

94.     When Plaintiffs pointed out the duplicative questions, Defendant Rosen insisted that they answer each and every one of them, yet again.

95.     Defendant Rosen and others on the BOA Board did this to styme and inhibit the Plaintiffs' application. Indeed, no other secular or other religious applicant had to go through a similar process. This also caused unnecessary delays and frustrated the application.

96.     In relation to the daycare, the Plaintiffs were questioned ad nauseum regarding the "curriculum."

97.     At one of these hearings, a BOA Member publicly pointed out that an application from a different religious organization application was not scrutinized the way Plaintiffs' application was scrutinized by the Defendant BOA and its Defendant Members.

98.     At a subsequent hearing, a BOA Member also publicly pointed out that the Defendant BOA, by and through its Defendant members, were handling Plaintiffs' application vastly different from other applications – where the BOA normally limited the number of times townspeople could come back to object, they refused to do the same for Plaintiffs and chose instead to re-open the matter, allowing townspeople to come back and object time and time again, taking up valuable time and subjecting Plaintiffs to endless questioning and increased costs.

17

99.    Defendants Rose and Meyer continuously held up Plaintiffs' application and allowed objectors to waste Plaintiffs' allotted time at these hearings in a clear effort to terminate, or at best, stall and delay the project.

100.    These delay tactics showed Plaintiffs that their efforts were futile – Defendants had no intention of approving the proposal but continued to hold one-sided hearings and adjourned meetings after meetings, all the while charging Plaintiffs tens of thousands of dollars for them.

101.    Additionally, Defendant Meyer during the time that Plaintiffs' application was before the BOA to the present, is the Chairperson of the BOA.  He has significant power in setting the agenda, running the meeting, dealing with professionals such as BOA attorneys and counsel, adjourning matters, delaying them, and is in charge of all business before the BOA, including this matter and the instant action.

102.    On or about September 2019, the Plaintiffs' then attorneys wrote a letter to Defendant Meyer as chairman of the BOA admonishing him of his treatment of Plaintiffs and advising him that his actions, and that of his co-defendants, likely violated Plaintiffs' RLUIPA and other rights.

103.    As the Chair, Defendant Meyer imposed his discriminatory will to frustrate, delay, and discriminate against Plaintiffs.

104.    He sets the tone for how applications will be treated, and the other BOA members follow his lead.

105.    From the inception of the application, Defendant Meyer was hostile to the Plaintiffs and unnecessarily combative.

106.    According to testimony, his initial statements to the Plaintiffs, even before their matter was heard, were that they did not know what was coming. That was a foreshadow of the discrimination and difficulty that Defendant Meyer would impose upon them.

107.    Further testimony revealed that he treated Plaintiffs in a discriminatory fashion by unnecessarily elongating their presentations, forcing Plaintiff through additional hurdles, treating Plaintiffs as nefarious simply because they were Muslims and Muslim Organizations, imposing requirements upon Plaintiffs that he did not do with other projects, and setting the tone for discriminatory conduct for the rest of the BOA. He otherized the Plaintiffs, making them seen nefarious and unworthy of consideration simply because of their protected statuses, including religion. He would treat Plaintiffs' non-Muslim attorney with kindness but would direct hostility to the Plaintiffs when addressing them directly and indirectly.

108.    According to additional testimony in this case, he often referred to them in a manner that made the Plaintiffs look shady, unworthy of consideration, and suspicions because they were Muslims, thereby creating a hostile environment for the Plaintiffs that other BOA members and member of the public picked up on and prolonged.

109.    His conduct was directly related to Plaintiffs' protected status as a religious organization, namely Muslims, and it is clear that his hostility from the inception of the application set the tone for the unlawful and disparate treatment visited upon the Plaintiffs by the BOA.

110.    In addition, he made the Plaintiffs go through the significant expense of resubmitting plans for minor changes Plaintiffs agreed to, all the while he was allowing secular developments that required substantial changes simply stipulate to the changes on the record.

19

111.   He prolonged the application process to drag it out so that he and the BOA could bleed Plaintiffs' resources and force them to withdraw the application.

112.   A BOA member has testified that Defendant Meyer was just clearly dragging Plaintiffs application despite it being a "done deal."

113.   Defendant Meyer sought to reopen up the parking portion of the presentation after it was closed, notwithstanding the fact that the BOA had never done so previously and it was widely accepted that when the parking component was presented and resolved, as was the case with the Plaintiffs, the application would usually be granted at the next meeting.

114.   Defendant Meyer bucked this trend with the Plaintiffs and continued to prolong the meetings at considerable time and expense to the Plaintiff by manufacturing patently irrational and baseless items to discuss. Even though the parking presentation was completed, and thus the application should have been approved according to one BOA member, Defendant Meyer continued to drag the matter on for additional meetings, further frustrating and delaying the Plaintiffs' application.

115.   A BOA member stated under oath that Jan Meyer treated Plaintiffs differently than other religious and nonreligious applicants that were before the Board.

116.   Amongst the examples provided, Defendant Meyer would prolong and delay the Plaintiffs' application by asking irrelevant questions about the number of toilets in the building, despite the fact that the plumbing was not the subject that night and was already done. He had never done this with any other applicant.

117.     Yet another example is when there was a question regarding a use, and Defendant Meyer began discussing chlorine and ridiculously stated that he wanted Plaintiff to hire a chlorine expert—something that the BOA has never previously required or asked about.

118.     Being the Chair, Jan Meyer's conduct established that he was only interested in frustrating, delaying, and dragging out Plaintiffs' application as long as possible.

119.     In fact, Defendant Meyer's actions were so obviously unlawful and discriminatory, one BOA member stated, in sum and substance, that Defendant Meyer's actions in regards to the Plaintiffs was going to result in a RLUIPA lawsuit against the BOA.

120.     The actions of Defendant Meyer were discriminatory against Plaintiffs' due to their religion and protected status and subjecting them to disparate and unequal treatment in violation of State and Federal Law.

121.     Defendant Meyer and the others aided and abetted each other and the Defendants in the discrimination against Plaintiffs

122.     The Plaintiffs were also questioned regarding their prayer services at these hearings, and if they would be having Friday prayers and regular prayers throughout the day.

123.     Defendants BOA and its members implied to Plaintiffs that they should not hold prayer services at the Site on a regular basis, despite the fact that Plaintiffs are religious institutions.

124.     No other religious organization was subject to the same restrictions.

125.     The Defendants' actions regarding the prayers were made in an effort to discourage prayer services and to have the Plaintiffs limit their prayer service and religious exercise.

21

126.     This was clearly an unreasonable burden upon Plaintiffs and their ability to freely exercise their religion.

127.     The reference regarding the curriculum and prayer services was a thinly veiled attack on the Islamic nature of the project.

128.     The Defendants BOA and its members were concerned that Islamic teaching would be taught at the Islamic Center, and this was the unlawful reason why the daycare, permits, and variance applications were held up and denied.

129.     In no other situation was the curriculum of a daycare included in an application.

130.     No other religious organization have had to answer questions regarding their "curriculum" or what would be taught at the daycare or school.

131.     Indeed, other religious groups and secular institutions operate daycares, and yet none of them had to endure questioning regarding their curriculum.

132.     The previous Church located at the Site was granted permission to maintain a religious school and daycare at the Site without any of the regulation, expense, or delay imposed upon the Plaintiffs by the Defendants.

133.     Despite the foregoing, Defendants continued to obstruct Plaintiffs' attempts to open their Islamic Center with its inexplicable denials and an endless and futile BOA process.

134.     As to the other matters that the Defendants forced Plaintiffs to bring before the BOA, it was clear that these issues would not be meaningfully considered, and that Plaintiffs would be subject to substantial burdens and unequal treatment.

135.     Many of the Plaintiffs' requests were minor in nature, including that the roundabout driveway is 145 feet away from the roadway where 150 feet was requested.

136.    Another minor request was the ADA ramp-a ramp that the Defendants previously granted to a Church in two days.

137.    Defendant Melfi then worked with the BOA and its members to impose numerous onerous requirements upon the Plaintiffs, many of which he knew did not apply or he was applying on unequal terms.

138.    For example, despite being in a Public Zone, which does not have dimensional, bulk, or conditional use requirements, Defendants Melfi, Teaneck, the BOA, and its Members imposed dimensional, bulk, and conditional use requirements upon the Plaintiffs in denying the initial permits. He then continued the same frivolous conduct during the hearings where he insisted that Plaintiff's needed a variance for these issues despite no legal requirement for them

139.    Even though there are no applicable dimensional, bulk, and conditional use requirements, such requirements were discriminatorily imposed upon Plaintiffs in denying their permit by Melfi and Teaneck, and then subsequently Defendant BOA and its members.

140.    No Christian or Jewish, or any other religious organizations had the same non-applicable zoning requirements imposed upon them, and instead they were correctly subject to the zoning requirements in their zoning area.

141.    Among other things, Defendants Teaneck, Melfi, and the BOA and its members arbitrarily applied a zoning ordinance to Plaintiffs but followed different standards to similar proposed land uses by non-Muslim houses of worship and by secular property owners.

142.    Similarly, secular projects were not subject to the superimposed zoning requirements from another zoning area.

23

143.     In fact, secular projects were given carte blanche to build as they saw fit as the Defendants BOA and its members waived nearly every major zoning requirement and granted significant and substantial variances to them.

144.     Indeed, in regard to several recent developments on State Street in Teaneck, the Defendants BOA and its members waived nearly every zoning requirement so that these secular projects could be built.

145.     This included significant variances and waivers, including but not limited to, waiving parking, density, and height requirements, and other significant zoning rules and regulations.

146.     The Plaintiffs, on the other hand, were forced by the Defendant BOA and its members to comply with inapplicable zoning rules and were subject to years of delay and denials for minor variances and/or permissible changes.

147.     Even more egregious, Plaintiffs were subjected to endless conversations about arbitrary "issues" like snow removal despite there being no requirement regarding snow removal in any applicable code, rule or regulation and the amount of chlorine in a pool.

148.     Defendant Mulligan, who often chaired the BOA meetings, repeatedly questioned Plaintiffs regarding snow removal with an aggressive tone while falsely suggesting that Plaintiffs were trying to involve the BOA in potentially illegal activity.

149.     In addition, Defendant Mulligan made a series of remarks publicly that outwardly displayed his discrimination and unlawful treatment of Plaintiffs.

150.     In regard to parking, Defendant Mulligan made a statement regarding where "Camels" will be able to park. He made this comment openly and other Defendant Board

Members heard it but took no action. Their behavior thereafter suggests that they condoned it and aided and abetted his discriminatory conduct.

151.    This comment was obviously discriminatory, racist, and aimed at attacking the protected status of the Muslim Plaintiffs before the BOA.

152.    In yet another comment, when discussing the daycare function at the Islamic Center, Defendant Mulligan referred to the Plaintiffs as "these people" and stated, in sum and substance, "do you really trust your children with these people, the daycare is a sham."

153.    Given his power as Chair of these meetings, his discriminatory comments clearly establish the unlawful conduct that was pervasive and employed throughout the proceedings.

154.    The actions and statements of Mulligan, Meyer, Rosen, and others on the BOA were indicative of how Defendant BOA and its members acted towards Plaintiffs that set the tone for the denial of Plaintiffs' application.

155.    The actions were clearly aimed at denying Plaintiffs the right to operate the Islamic Center and were clearly made in a discriminatory fashion in violation of Federal and State law.

156.    Defendants' actions directly interfered with Plaintiffs' ability to use the Site as a house of worship to exercise their religion and open the center for the community.

157.    Further, a review of the uses and requests of the previous Church and the Islamic Center reveal a glaring double standard to inhibit the Islamic Center.

158.    The Church was instantly and seamlessly granted several application approvals and variances that are identical to the one sought by Plaintiffs, including for a ramp and to operate an education center there.

159.     The Plaintiffs, on the other hand, had its applications rejected outright by Defendants Teaneck and its senior zoning officer Melfi, and were forced to endure an endless and pointless BOA process whereby its applications were never fully, meaningfully, or completely considered and not considered in accordance with the same standards as the Church, secular institutions, and other religious projects.

160.     For example, the Church was permitted to build a ramp, but the Plaintiffs could not.

161.     Moreover, the Church was not required to pay any fees or costs. The Plaintiffs Islamic Center, however, was not only required to pay significant application fees, but were also required to pay tens of thousands of dollars in costs to fund the unlawful opposition against them.

162.     In yet another example, while the Church was permitted to maintain a prayer space, Defendants refused to permit Plaintiff to maintain the exact same prayer space.

163.      In yet another example, Defendants Teaneck, Melfi, BOA and its members continued to purposefully misconstrue the Site's uses in order to inflate the parking requirements to numbers impossible to attain.

164.     The purpose of this purposeful misconstruction is clear: by purposefully mislabeling it, the Defendants believed they could usurp the guaranteed religious protections Plaintiffs are entitled to and could instead assert additional unnecessary and onerous requirements upon the Plaintiffs with impunity to inhibit and extinguish Plaintiffs from ever becoming functional.

165. Defendants imposed onerous traffic calculations to require frivolous and astronomical amounts of parking at the Site. Initially, the plans had 63 parking spaces, which Defendant Melfi deemed to be sufficient.

166. This was vastly different that Defendant's Melfi's subsequent claim during the application process before the BOA that the Site required 300 parking spaces, which he knew would be prohibitive for the Site, impossible to attain, and did not comport with the requirements placed on the School or Church that previously occupied the Site.

167. Melfi's erroneous parking calculations were issued in concert with Defendant BOA and its members and aimed at inhibiting the use of the Islamic Center.

168. Upon information and belief, Defendant Melfi worked with Defendants BOA, Meyer, Rosen, Mulligan, and other Defendants on the BOA to issues erroneous and impossible requirements that they then imposed upon Plaintiffs, ensuring that Plaintiff's applications would never be granted, and Plaintiffs would never be able to operate.

169. According to Defendants' perverted calculations, the Islamic Center proposed at the Site somehow would need more parking than the previous public school and church (which also had a daycare and school) combined.

170. In addition, unlike with other, non-Islamic religious institutions and secular developments, the Defendants Melfi, BOA, and its individual members refused to consider the ample parking available on the street.

171. The Site, nearly 2.25 acres, had ample street parking surrounding it.

172. Rather than consider the street parking around the Site, as they had done for other secular projects and non-Islamic religious institutions, Defendants Teaneck, Melfi, BOA, and its

27

individuals members refused to consider the ample street parking in denying Plaintiffs their permits and application. Defendants Teaneck, Melfi, BOA, and its individual members were using parking as an excuse to deny the permits Plaintiffs sought as well as prolong and ultimately deny the Plaintiffs' application before the BOA. Indeed, Defendant BOA and its members worked in concert to place as many roadblocks as possible for the Plaintiffs. Without the actions of the Defendant BOA and its individual members, Plaintiffs would have had their application approved.

173.   While Defendant BOA members have tried to hide behind the BOA as an entity, the fact of the matter is the unlawful treatment of Plaintiffs could not have occurred without each of their individual involvement. This included the setting of the tone for discrimination from the outset of the meeting, asking questions that unnecessarily prolonged and delayed the application, permitting the public to frustrate and delay the application, and ultimately deny it.

174.   Given that a majority rules, any number of Defendant BOA members could have voted to stop the unlawful conduct complained of herein and/or voted to approve the applications that were being held up solely to discriminatory conduct.

175.   What is more, rather than simply apply straight forward calculations regarding parking, the Defendants nefariously double and triple counted the need for parking simply to ensure that there was no way that the Islamic Center could produce the requisite parking spaces needed to function.

176.   Defendant Rosen insisted that the Plaintiffs failed to properly consider the number of parking spaces and questioned them endlessly – forcing Plaintiffs to answer questions regarding extreme hypotheticals and go into extreme details regarding potential events and other

alleged considerations when there are specific calculations that would properly account for the necessary number of parking spaces.

177.     For example, the Defendants counted the daycare, religious instruction, and Islamic Center as being used at all times simultaneously to artificially increase the parking spaces required to inhibit the establishments and use of the Islamic Center.

178.     Astonishingly, while Defendants sought to impose these novel and ridiculous interpretations for setback, parking, and other issues for the Islamic Center, they were literally changing the zoning codes to accommodate secular developments blocks away.

179.     Defendants virtually threw out their zoning laws in granting astounding permits and variances to various secular projects.

180.     By way of further example, the Defendants dispensed with the longstanding zoning law for others that limited any building height to three stories in favor of a development that requested, and was granted, the right to build fifteen stories.

181.     Additionally, unlike the unreasonable and unfounded parking analysis Defendants imposed upon the Islamic Center, secular projects were given favorable treatment that included not double and triple counting uses for parking purposes, considering street parking when analyzing parking spaces, and permitting these projects to maintain less parking spaces that zoning laws required.

182.     What is more, several developments were given permits/variances to use one parking space as a tandem space, thereby multiplying the same parking space for parking analysis proposes.

183.    While the Defendants Melfi, BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown were waiving numerous zoning and code laws to accommodate these developments, they were imposing onerous and harsh rules against the Islamic Center, including denying the request to build an ADA compliant ramp, and not permitting a round-about for the safe dropping off of children because it was a few feet short of the Defendants' request.

184.    Further magnifying the discrimination imposed upon the Islamic Center is the fact that, in denying the request to construct and ADA-compliant ramp, the Defendants claimed that the lot coverage number in the architect's plans were 57.1%, but that the engineering plans listed the lot coverage number as 57.2%, and thus the discrepancy of 0.01% was a basis to deny the permit. This is for a property consisting of nearly two and a half acers.

185.    The ridiculousness of such a claim is astounding, particularly as the Defendants approved town-changing permits and variances to developers and makes clear that the Defendants denials are nothing more than cover for their discrimination.

186.    In yet another stark example of discrimination, the Defendant BOA and its members, including Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown, allowed a major development to simply stipulate to a major parking addition, without the need for any plans, drawings, or further submissions. This included adding an entirely new parking deck. Plaintiffs, on the other hand, were forced to return repeatedly to present new plans on the drawing of lines in a parking area. These types of matters are routinely stipulated to or

waived for other applicants, yet Plaintiffs were forced expend significant time and money on this issue to appease Defendant BOA and its members.

187.    The discrimination and violation of RLUIPA and the Constitutions of the United States and New Jersey could not be possible without the involvement of each BOA Member.

188.    The Defendants continued to treat the Plaintiffs in a manner vastly different than other religious organizations and secular entities.

189.    While the Islamic Center was being denied permission to install and ADA-Compliant ramp, or an elevator, Defendants Melfi, BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown were giving developers permission to build fifteen floor towers where only three floors are permitted in contravention of nearly every zoning rule.

190.    Defendants BOA and its individual members further discriminated against Plaintiffs by requiring them to pay tens of thousands of dollars to the Defendants' experts, simply to get the run around.

191.    Defendants forced Plaintiffs to place nearly thirty-five thousand dollars ($35,000) in escrow with Teaneck. Teaneck then used these funds to hire an army of professionals to oppose the Plaintiff, issue erroneous findings, and seek to justify the discrimination against Plaintiffs.

192.    Astoundingly, Defendants have used up the initial escrow, and are demanding that Plaintiffs plane an additional twenty-five thousand dollars ($25,000) in escrow to fund the unlawful discrimination against Plaintiffs.

193.    The additional twenty-five thousand dollars ($25,000) is not a cap, but only the next round of funds demanded by Defendants, with no end in sight.

194.    Plaintiffs have been told that if they do not fund the escrow, the Defendants will not entertain their applications-applications that should not be before the BOA but for the discriminatory actions of the Defendants.

195.    No other secular or religious entity has been forced to make such a payment on a similar application.

196.    Such conduct is on its face discriminatory, unlawful, and wreaks of bad faith.

197.    Indeed, there is no reason to spend that sum of money for the minor permits and/or variances Plaintiff seek, particularly when the Defendants BOA and its members are allowing more than six-major secular developments to proceed ahead of Plaintiffs, with less approval times, and no escrow amounts. Each BOA member made the conscious decision to provide the approvals and waivers for these other comparators, but then also made the decision to treat Plaintiff less favorably and not subject them to the same favorable treatment because of the Islamic nature of the project.

198.    Nor is it lawful to require the Plaintiffs, as a condition of entertaining its applications, to fund the unlawful and discriminatory fight against them.

199.    Yet another example of the unlawful conduct of Defendants BOA and its Members, is the constant and unilateral postponing of the hearing on Plaintiffs' applications. Each member of the BOA is involved with making the decision to delay the application and refuse to schedule it, especially Defendant BOA's chair, Defendant Meyer.

32

200.    While the Defendants BOA and its members refuse to entertain Plaintiffs' applications, they continue to hear other matters and applications. Even during the pandemic, Defendants Melfi, BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown continued to hear applications over Zoom, but refused to hear the Plaintiffs' application or calendar it.

201.    This is in addition to the more than two years the Defendants have strung Plaintiffs along, all the while denying them relief and or moving the goal posts on them.

202.    Even when Plaintiffs have taken the course of appeasement, the Defendants Teaneck, Melfi, Myszka BOA, and its members find new, creative ways to inhibit the project-a clear sign that the goal is to delay the Islamic Center into perpetuity or until it runs out of funds.

203.    For example, when the Defendants Melfi, Boa, and its members asked for an increase in parking spaces after the initial application, Plaintiffs obliged despite the fact that they were not obligated to do so and the Defendants were granting variances to secular and other religious projects greater than any needed by the Islamic Center.

204.    In fact, when Defendants Teaneck and Melfi claimed that the initial 63 parking spaces, which Defendant Melfi claimed was initially sufficient, were not enough and that 93 parking spaces were required, the Plaintiffs downsized the project to create a total of 99 parking spaces. This required the Plaintiffs to remove amenities and features of the Islamic Center in order to comply with the superficial and erroneous demand for parking.

205.    Plaintiffs achieved greater parking spaces by removing outdoor fields where the congregants and their children could play, hold activities, and congregate, thereby downsizing and limiting the use of the Site.

206.    The Islamic Center also agreed to limit the number of persons at the Center, despite no obligation to do so, in order to further appease the onerous parking requirements imposed upon them.

207.    The Islamic Center's attempts at appeasement were met with yet another request for an increase in parking spaces.

208.    Despite increasing the parking spaces to more than Defendants requested, Defendants Melfi, BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown yet again moved the goal line and stated that 99 parking spaces were not enough, and now demanded nearly 300 parking spaces.

209.    Defendants' weaponizing of the zoning codes, which do not apply to Plaintiffs who were located in the P Zone, was magnified when at a hearing it was revealed that a secular community center in Teaneck that was twelve percent bigger than the Islamic Center was required to have less parking than the Islamic Center.

210.    Stated differently, Defendants Melfi, BOA, and its members imposed a greater parking requirement upon the Islamic Center than a larger secular Center.

211.    The Islamic Center was twelve percent smaller than this secular center, yet Defendants Teaneck, Melfi, the Boa, and its members were imposing that the Islamic Center have parking greater than that of the secular center.

34

212.     The tripling of the parking spaces required was a clear signal that at no point would Defendants Melfi, the BOA, and its Members meaningfully consider the Plaintiffs' application and their intention was to delay the project to the point where Plaintiffs would either run out of money or be unable to obtain approvals.

213.     The current course of conduct is clearly aimed at inhibiting the project, and it has worked. There are no religious services and community members are not permitted on the site.

214.     The religious community center does not have a certificate of occupancy, temporary or otherwise, and is not allowed to have anyone there.

215.     The Islamic Center is not operational and continues to be defunct as a result of the Defendants' conduct.

216.     Defendants' actions cost the Plaintiffs a significant amount of time, money, and the ability to worship and practice their faith.

217.     Indeed, the Islamic Center cannot lawfully operate, provide religious services, Islamic-compliant recreational opportunities, fellowship, and is vastly undersized due to the Defendants' unlawful restrictions.

218.     The Defendants' discriminatory and unequal treatment of Plaintiffs is glaring.

219.     In fact, at least one BOA Board Member recognized the unequal and discriminatory treatment Defendants were engaging in. A BOA Board Member stated on the record that certain requirements being imposed upon the Plaintiffs were discriminatory and unequal. In another instance, the Board Member publicly questioned why the BOA was imposing requirements for revisions where they had not imposed the same requirements upon Yeshivas or secular applications.

35

220.     In yet another instance, the same Board Member publicly questioned why the time for community opposition was extended and time for opposition was permitted to take precedence over the actual application and take up the precious time.

221.     Indeed, the discrimination and unlawful conduct was so apparent, the BOA's attorney, on the record, admonished the BOA regarding its conduct and reminded them of the protections RLUIPA provides the Plaintiffs.

222.     Further, after one session in which the Plaintiffs' applications was heard, Defendant BOA member stated publicly that Defendant Meyer just bought the BOA a RLUIPA lawsuit.

223.     Defendant BOA and its members ignored these warnings and instructions despite having a duty to interject and intervene. Instead, they all went along with the discrimination, condoned it, and voted to deny the application notwithstanding the delay and frustration they saw play out before them over years.

224.     The unlawful conduct of Defendants Melfi, Teaneck, and the BOA was clear to its members, yet none of them took any meaningful action to inhibit it. Instead, they all continued to go along with the unlawful treatment of the Plaintiffs, partook in it, and voted to deny the Plaintiffs' application.

225.     In yet another example of Defendant BOA and its members' unlawful conduct, Defendants BOA and its members consistently permitted cross examination, questions, and other interruptions during each of Plaintiffs' witnesses, and continuously held up the application process in doing so. At no point did the Defendants BOA and its members inhibit this conduct, but rather permitted it to proceed and encouraged it. Despite there being concerns raised as to

36

why the public was being encouraged to obstruct the application, the BOA and its members persisted in giving the obstructionist safe harbor.

226.    Hours upon hours were spent with Plaintiffs' professionals testifying before the BOA, with the BOA unlawfully permitting interruptions, unscheduled cross-examination, and other delays so as to run out the clock on the presentation and get absolutely nowhere.

227.    The BOA accomplished these delays both through their conduct and by permitting the public to intrude on the Plaintiffs' time.

228.    In every other matter, the applicant was permitted to put on its case, and cross examination is left to the end.

229.    Additionally, in every other application, cross-examination and public comments were limited, and the applicant was heard in a few meetings, which ultimately resulted in approval.

230.    In other applications, Defendants BOA and its members limited any discussion to only the matters presented to the BOA. For Plaintiffs, however, Defendants BOA and its members permitted and encouraged the public to ask any questions irrespective of whether the topic was already heard and resolved, the questions were relevant, or the public was engaged in discriminatory actions.

231.    Rather than pursue the efficient method they used with other applications, whereby questions were permitted only on the topic presented, Defendants BOA and its members purposefully and discriminatorily permit cross examination of every witness by every member of the public, thereby unlawfully elongating the process such that there will never be a true conclusion to the application.

232.    The BOA and its members did not permit similar tactics with Yeshiva applications, or secular applications such as the developments discussed herein. This was a decision made by each BOA member to treat Plaintiffs' application differently than others.

233.    While the BOA continuously delayed the consideration of the Plaintiffs' application, it continued to permit interruptions and nonsensical questioning from public opposition when the applications were heard.

234.    While Defendants BOA and its members continued to claim that they did not have enough time to consider the Plaintiffs' application, it nonetheless continued to permit public opposition to the application use the majority of the time allotted to Plaintiffs.

235.    This not only caused a substantial delay to the consideration of the application, but also caused the Plaintiffs to incur substantial fees and costs.

236.    Additionally, the Defendants BOA and its members routinely threatened the Plaintiff with denials if the Plaintiffs did not consent to extending the time for the Defendants to "rule" on the application.

237.    Defendants BOA and its members routinely told Plaintiffs that if they did not extend the time for the BOA to "rule" on the application, which was unnecessarily prolonged by the BOA and its erroneous demands for payment and other machinations, Defendants BOA by and through its member would vote immediately and deny the application. Defendants BOA and its members coerced Plaintiffs into granting endless extensions.

238.    In fact, throughout several appearances before the BOA, Defendant BOA members expressed outright hostility toward the Plaintiffs, and indicated that they had pre-judged the application before it was complete and ready to deny it.

38

239.     Members of the BOA, including Mulligan, Rosen, Meyer, and others made several comments indicating that there was no legitimate consideration of the application, and the hearings were a charade that would simply end in a denial if the Plaintiffs could not be bled of their funds first.

240.     Several BOA members, including but not limited to Defendant Board Members Meyer, Rosen and Brown, stated in aggressive tones, in sum and substance, that they were ready to deny the application on the spot (despite the fact that it was not yet fully presented), and that the application had little chance of being approved no matter what was suggested by Plaintiffs.

241.     Upon information and belief, Defendant Board Member Rosen initiated the motion to deny Plaintiffs' application, which was seconded by Defendant Board Member Brown, and supported with affirmative votes to deny Plaintiffs' application by Defendant Board Members Barta, Wetrin, Mermelstein, Meyer, Green, Honis and Prince.

242.     Defendant BOA members voted to deny the Plaintiffs' application for no lawful or legitimate reason. Defendants Meyer, Mulligan, Barta, Wetrin, Mermelstein, Green, Honis and Prince unlawfully voted to deny the Plaintiffs' application. They pressured the Plaintiffs to go through an application process that would never result in an approval, and then sought to extort an extraordinary seventh extension from the Plaintiffs under the threat of denial.

243.     The request for a seventh extension was nothing more than yet another step in the Defendants BOA and its members' plan to keep the application in limbo, bleed Plaintiffs dry with fees, and do everything they can to stop the Plaintiffs from operating.

244.     No other religious organization or secular project was subject to these rules, regulations, and conduct.

39

245.    Other religious and secular applicants were permitted to present their application uninterrupted in a few short meetings, unlike what is being done to Plaintiffs.

246.    Plaintiffs have been going through this process for years with no end in sight.

247.    The Defendants have demanded that Plaintiff pay Twenty-five thousand dollars ($25,000) to have their application to be heard.

248.    This is in addition to the nearly thirty-five thousand dollars ($35,000.00) Plaintiffs already paid the town to be heard.

249.    No other secular or religious organization has had to pay any sums to have their application heard, and no other entity has been told that if they do not pay, the application will not be considered.

250.    Indeed, huge developments in Teaneck that involved substantial development were charged less than the Plaintiffs in escrow fees.

251.    For example, 100 State Street, a 68-unit apartment complex that was being built from the ground up, was only asked to pay $53,981.76 in escrow fees. That project was approved by the in only a few meetings despite objections from residents.

252.    Similarly, a fifteen-story mixed use building in Teaneck that contained 147 units called 189 the Plaza, was only asked to provide $45,300.00 in escrow fees. The building height is 173 feet, nearly five times the 35 feet allowed. The lot coverage for 189 The Plaza is 97%, rather than the 25% allowed by statute. The rear setback for the project is 5 feet, instead of the minimum 20 feel required. Despite the enormity of the project and the vast variances it needed, the project was only required to place $45,300 in escrow fees. This is in stark contrast to the Plaintiffs, who were not seeking to add any height, was a pre-existing building, and was seeking

40

minor charges in which was not actually required in the P zone, and who were requested to pay more than double the 15 story 189 the Plaza project.

253.     Stunningly, 189 the Plaza was approved in just three meetings. Plaintiffs, however, were relegated to seven meetings over years with no end in sight until the BOA denied their application.

254.     In addition, another mega project located at 1475 Palisades in Teaneck NJ approved by the BOA was a 127-unit development that requested significant variances to complete such a development was heard and approved by the BOA in just four meetings.  In discovery, Defendant BOA claims to not know how much in escrow fees this mega project paid, but if its comparators are any indication, this mega project was asked to pay less than half of what the Plaintiffs were asked to pay.

255.     Furthermore, upon information and belief, the Church formerly at the site did not have to pay any funds for its permits or applications.

256.     Essentially, the Defendants have imposed an unlawful tax and cost upon the Plaintiffs' application.

257.     Such a tax/cost is patently unlawful, and same has not been imposed upon any Christian or Jewish centers, or upon any of the many secular projects swiftly approved by the Defendants.

258.     On or about October 1, 2020, Defendants denied Plaintiffs' BOA application.

259.     The individually named BOA member Defendants – Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Price, Jerry L. Barta, Edward Mulligan, Mark

Mermelstein, Zev Green and James Brown – upon information and belief, all individually voted to deny Plaintiffs' application.

260.    The denial was a continuation of the discriminatory and unlawful treatment set by the BOA Chair, Defendant Meyer. His fellow board members and Defendants followed him in treating Plaintiffs unlawfully as they have done from the inception of this matter.

261.    The BOA does not exist without the action and direction from its members, and without the conduct of the individual members, the BOA would not, and could not, have taken the unlawful actions complained of herein.

262.    The BOA members acted as a collective unit by and through the BOA conspiring to impose erroneous requirements on Plaintiffs, jointly adjourned Plaintiffs' application endlessly while imposing fees on Plaintiffs in the tens of thousands of dollars for an opportunity to be heard.

263.    Defendants BOA and its members denial was discriminatory, unlawful, and not based upon any legitimate reasons.

264.    The direct result of the BOA's denial was that Plaintiffs were unable to open their Islamic Center and house of worship and were unable to provide same for those in their community that sought a safe place to practice their religion and congregate. It was a continuation of the unlawful conduct complained of herein.

### UNLAWFUL IMPOSITION OF REQUIRMENTS THROUGH ORDINANCE

265.    On or about January 18, 2022, Defendant Teaneck has amended its zoning laws to impose additional rules, regulations and requirements upon Plaintiffs that did not previously exist.

266.    For example, Plaintiffs were in the public "P" zone when initially applying, but they now fall under a new "community overlay" zone that was newly created following the filing and partial litigation of Plaintiffs' claims.

267.    This amendment to the zoning law is unlawful, unjust and reflects the unequal treatment of Plaintiffs and is clearly retaliatory in nature.

268.    Defendant Teaneck do not proffer any legitimate reason for its new zoning rules and regulations, nor could they, as the amendments were taken to impose new barriers for Plaintiffs to adhere to in hopes of gaining tens of thousands of more dollars in fees and expenses allegedly for administrative purposes.

269.    The Ordinance does not render Plaintiffs' application to the BOA moot.

270.    In fact, it has the opposite effect. The Ordinance now renders the Property per se illegal as the existing structure of the property, which has remained unchanged since it was a school, does not comply with the new requirements imposed by the Ordinance. On one day the Property was not in violation of any zoning rules, ordinance, or regulation, but now all of a sudden is the next day.

271.    Indeed, a review of the Ordinance reveals that while certain uses may be permitted at the Property, which they were anyway, the Ordinance imposed dimension, bulk, and other requirements that did not previously exist for the Property.

272.    Furthermore, the new bulk and other requirements imposed by the Ordinance is incompatible with the Islamic Center's current parameters, thereby imposing a defacto requirement that Plaintiffs go back to the BOA.

43

273.     The effect of the Ordinance is that now Plaintiffs must go back to the BOA due to the new requirements, instead of previously having no requirements and therefore not being required to before the discriminatory Defendant BOA.

274.     In essence, while the Ordinance seemingly permits certain uses at the Islamic Center at the property, it also imposes restrictions that require the Plaintiffs to return to the BOA. The P Zone, in which the property is located, does not have any conditional uses, dimensional, density and other bulk restrictions, or any other provisions or requirements. By statute, the Islamic Center and its recreational facilities and associated uses were per se permitted at the Property as they were previously permitted for the Church.

275.     The Ordinance does not obviate the need to go before the BOA. Rather, it now mandates that Plaintiff do so whereas previously Plaintiffs did not have to go to the BOA.

276.     Whereas Plaintiffs previously did not have to comply with the restriction-free P Zone, now Plaintiffs have to comply with restrictions imposed upon it by the Ordinance or go before the BOA.

277.     While the Defendants have generously cast the Ordinance to bypass the unlawful actions taken by the BOA and its members so that Plaintiffs do not need to further suffer through further discrimination and unlawful actions, the practical effect of the Ordinance is to mandate that Plaintiffs go right back to the BOA for variances on the newly imposed restrictions.

278.     For example, the Ordinance imposes new requirements as follows:  maximum lot coverage of 60%, minimum parking spaces, and maximum building coverage. The proposed Islamic Center's lot coverage is 84%. As it exists now, the Islamic Center does not comply with

44

the imposed lot coverage and its mere existence now requires it to go to the Defendant BOA because of the Ordinance.

279.    The Ordinance does nothing more than offer the veneer of permitting the Islamic center to open and bypass the discriminatory BOA and its members, but factually it imposed requirements that did not otherwise exist that now mandate Plaintiffs return to the BOA.

280.    Based on the above facts, the Defendants' actions are discriminatory in nature and are intended to prevent the Plaintiffs from permanently opening and operating its house of worship/religious education building and Islamic Center through the discriminatory application of land use regulations, in violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. 2000cc, et seq. ("RLUIPA") and the Constitutions of the United States and New Jersey.

281.    Based on the above facts, the Defendants' actions are arbitrary, capricious and unreasonable and do not serve any legitimate, rational governmental purpose under the Fourteenth Amendment to the United States Constitution.

282.    Based on the above facts, Defendants impose an unreasonable and unequal burden upon Plaintiffs.

283.    The Plaintiffs' building is a "religious institution" within the meaning of 42 U.S.C. 2000cc et seq.

284.    The effect of the Defendants' Teaneck, Melfi, Myszka, BOA, and its members actions thus far is to discriminate against the Plaintiffs based on religious affiliation and to treat the Plaintiffs on less than equal terms with a non-religious institutions, discriminated against Plaintiffs on the basis of the Islamic faith in violation of RLUIPA, as well as the New Jersey

Law Against Discrimination (N.J.S.A. 10:5-1 et seq.), the New Jersey Civil Rights Act (N.J.S.A. 10:6-1 et seq.), and under the New Jersey and United States Constitutions.

285.    The effect of Defendants' Teaneck, Melfi, Myszka, BOA, and its members conduct is to unduly restrict the Plaintiffs use and development of its land in violation of 2 U.S.C.2000cc-3(g) and 42 U.S.C. 2000cc-5(5) of RLUIPA.

286.    Defendants Teaneck, Melfi, Myszka, BOA, and its members have acted under color of state law in failing to issue a permit and approvals to Plaintiffs with the purpose and effect of discriminating against Plaintiffs solely because of religious beliefs and/or affiliation.

287.    Defendants Teaneck, Melfi, Myszka, BOA, and its members have denied Plaintiffs due process of law by the arbitrary way it has treated Plaintiffs in refusing to lawfully and legitimately consider Plaintiffs application in support of the issuance of a permit and/or BOA approval.

288.    Defendants Teaneck, Melfi, Myszka, BOA, and its members have utilized and are utilizing their enforcement powers to threaten, intimidate, harass, and coerce the Plaintiffs after they have exercised their rights under RLUIPA, as well as the New Jersey Law Against Discrimination (N.J.S.A. 10:5-1 et seq.), the New Jersey Civil Rights Act (N.J.S.A. 10:6-1 et seq.), and under the New Jersey and United States Constitutions.

289.    By and through the conduct described herein, Defendants Teaneck, Melfi, Myszka, BOA, and its members are intentionally and maliciously harassing, intimidating, and interfering with the Plaintiffs and persons associated with the Plaintiffs with the intent of preventing the Plaintiffs from opening and operating the existing religious facility.

290.    Plaintiffs cannot open nor operate an Islamic Center, that includes prayer space and other religious instruction.

291.    Nor can Plaintiffs open or operate an Islamic Center for its congregants, where its members can congregate, receive religious instruction, and have a sense of community.

292.    The activities at the Islamic Center are aimed at fostering the Islamic Community, where members can pray, work out, and enjoy religious comradery.

293.    Defendants Teaneck, Melfi, Myszka, BOA, and its members are using land use regulations, which are inapplicable to Plaintiffs, to deny Plaintiffs their right to exercise religious practices.

294.    Defendants Teaneck, Melfi, Myszka, BOA, and its members are purposefully applying arbitrary, erroneous, and biased purported land use and zoning regulations and rules upon Plaintiffs simply because it intends to hold religious instruction and foster an Islamic Community where members of the faith can pray, worship, work out engage in fellowship and recreational activities, despite the fact that the religious instruction and service is does not exceed the capacity of the persons permitted under the pre-approved filings.

295.    The purpose, intent, and effect of Defendants' actions is to inhibit and prohibit the exercise of religion.

296.    Defendants Teaneck, Melfi, Myszka, BOA, and its members have used the land use regulation to prohibit Plaintiffs to occupy the Islamic Center lawfully and thrive as an Islamic Community.

297.    Defendants' denial of Plaintiff's permit and any necessary variances was arbitrary, capricious, unreasonable, unlawful, irrational, shocking to the conscience and done without a valid legal basis.

298.    Defendants Teaneck, Melfi, Myszka, BOA, and its members are violating Plaintiff's civil rights in violation of 42 U.S.C. Section 1983, by their actions as set forth above, including but not limited to:

A.    acting under color of law to unlawfully deprive Plaintiff and its members of their state and federal rights to freely practice their religious beliefs, their right to religious assembly and/or their rights to equal protection and substantive due process under the New Jersey and United States Constitutions, including, without limitation, the Fourteenth Amendment to the United States Constitution; and

B.    acting under color of law to unlawfully interfere with Plaintiff's and its members' exercise of their state and federal rights and their right to freely practice their religious beliefs through threats, intimidation and coercion.

## COUNT I-RLUIPA-SUBSTANTIAL BURDEN
### Against Defendants Teaneck and BOA

299.    Plaintiff re-allege and incorporate herein by reference all paragraphs as if alleged herein.

300.    Defendants' Teaneck and BOA treatment of Plaintiffs and denial of Plaintiffs' permit, variances, and certificate of occupancy requests constitutes the imposition or implementation of a land use regulation that imposes a substantial burden on Plaintiffs' religious exercise, which burden is not in furtherance of a compelling governmental interest and/or is not

48

the least restrictive means of furthering such interest, in violation of RLUIPA, 42 U.S.C. Section 2000cc(a)(1).

301.    In addition, even of the regulations were to apply to Plaintiffs, Defendants' Teaneck and BOA's application of these regulations was unequal, discriminatory, and imposed upon Plaintiffs in a way to inhibit the Islamic Center's existence, use, and functions.

302.    Defendant Melfi and Teaneck also denied Plaintiffs' permit applications, including for a ramp that they approved for a Church under the same circumstance, forcing them to go to Defendant BOA, and then continually participating and colluding with Defendant BOA and its Defendant members to engage in discriminatory conduct aimed at frustrating and denying Plaintiffs' application.

### COUNT II-RLUIPA-EQUAL TERMS AND LIMITATION
### Against Defendants Teaneck and BOA

303.    Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

304.    Defendants' Teaneck and BOA treatment of Plaintiffs and their denial of Plaintiffs' permit, any variances, and certificate of occupancy, constitutes the imposition or implementation of a land use regulation that treated, and continues to treat, Plaintiffs on less than equal terms with a nonreligious assembly or institution in violation of RLUIPA, 42 U.S.C. Section 2000cc(b)(1). It also violated Plaintiffs' rights under RLUIPA against the prohibition of unlawful limitations.

305.    Defendant Melfi and Teaneck also denied Plaintiffs' permit applications, including for a ramp that they approved for a Church under the same circumstance, forcing them

to go to Defendant BOA, and then continually participating and colluding with Defendant BOA and its Defendant members to engage in discriminatory conduct aimed at frustrating and denying Plaintiffs' application.

306.    In addition, even of the regulations were to apply to Plaintiffs, Defendants' application of these regulations was unequal, discriminatory, and imposed upon Plaintiffs in a way to inhibit the Islamic Center's existence, use, and functions.

307.    Defendants discriminated against Plaintiffs on the basis of religion throughout the permit and BOA process, including unlawfully denying permits, delaying, frustrating, imposing inapplicable rules and regulations upon Plaintiffs, and treating them in a disparate and discriminatory manner

**COUNT III-RLUIPA-DISCRIMINATION**
**Against Defendants Teaneck and BOA**

308.    Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

309.    Defendants Teaneck and BOA treated Plaintiffs and its permit, variances, and certificate of occupancy applications differently from other such applications on the basis of religion or religious denomination, in violation of RLUIPA, 42 U.S.C Section 2000cc(b)(2).

310.    Defendants treated Plaintiffs in a hostile and negative manner in comparison to other religious institutions.

311.    Further, Defendants Melfi and Teaneck denied Plaintiffs' permit applications, including for a ramp that they approved for a Church under the same circumstance, forcing them to go to Defendant BOA, and then continually participating and colluding with Defendant BOA

and its Defendant members to engage in discriminatory conduct aimed at frustrating and denying Plaintiffs' application.

312.    In addition, even of the regulations were to apply to Plaintiffs, Defendants' application of these regulations was unequal, discriminatory, and imposed upon Plaintiffs in a way to inhibit the Islamic Center's existence, use, and functions.

## COUNT IV-NEW JERSEY LAW AGAINST DISCRIMINATION
### (Against all Defendants)

313.    Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

314.    Defendants Teaneck, Melfi, Myszka, BOA, and its members are violating Plaintiffs' rights under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., by its actions as set forth above, including, but not limited to:

A.    regulating land use in a manner that discriminates against Plaintiffs and their members;

B.    unlawfully denying and otherwise making the permits and certificate of occupancy unavailable to the Plaintiffs and their members because of their religious creed, beliefs, denomination and/or affiliation;

C.    illegally regulating use and certificate of occupancy requirements in a manner that discriminates against Plaintiffs and their members on the basis of religious creed, beliefs, denomination and/or affiliation;

D. Discriminating against Plaintiffs on the basis of religion throughout the permit and BOA process, including unlawfully denying permits, delaying, frustrating, imposing inapplicable

rules and regulations upon Plaintiffs, and treating them in a disparate and discriminatory manner; and

E. Defendant Melfi and Teaneck denying Plaintiffs' permit applications, including for a ramp they granted to a church under the same circumstances, forcing them to go to Defendant BOA, and then continually participating and colluding with Defendant BOA and its Defendant members to engage in discriminatory conduct aimed at frustrating and denying Plaintiffs' application.

315.    In addition, even of the regulations were to apply to Plaintiffs, Defendants' application of these regulations was unequal, discriminatory, and imposed upon Plaintiffs in a way to inhibit the Islamic Center's existence, use, and functions.

<u>**COUNT V-NEW JERSEY CIVIL RIGHTS ACT**</u>
<u>**(Against all Defendants)**</u>

316.    Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

317.    Defendants' Teaneck, Melfi, Myszka, BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown denial of Plaintiffs' permit, variances, and certificate of occupancy application, was arbitrary, capricious, unlawful, irrational, shocking to the conscience and done without a valid legal basis based upon discrimination based upon Plaintiffs' Islamic character.

318.    Defendants are violating Plaintiff's civil rights in violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 through 10:6-2, by their actions as set forth above, including but not limited to:

A.      acting under color of law to unlawfully deprive Plaintiffs and their members of their state and federal rights to freely practice their religious beliefs, their right to religious assembly and/or their rights to equal protection and substantive due process under the New Jersey Constitution;

B.      acting under color of law to unlawfully interfere with Plaintiff's and its members' exercise of their state and federal rights and their right to freely practice their religious beliefs through threats, intimidation and coercion;

C. Discriminating against Plaintiffs on the basis of religion throughout the permit and BOA process, including unlawfully denying permits, delaying, frustrating, imposing inapplicable rules and regulations upon Plaintiffs, and treating them in a disparate and discriminatory manner

D. Defendant Melfi and Teaneck denying Plaintiffs' permit applications, including for a ramp to a church under the same circumstances, forcing them to go to Defendant BOA, and then continually participating and colluding with Defendant BOA and its Defendant members to engage in discriminatory conduct aimed at frustrating and denying Plaintiffs' application.

319.     In addition, even of the regulations were to apply to Plaintiffs, Defendants' application of these regulations was unequal, discriminatory, and imposed upon Plaintiffs in a way to inhibit the Islamic Center's existence, use, and functions.

## COUNT VI. VIOLATION OF THE UNITED STATES CONSTITUTION:
## PLAINTIFFS' DUE PROCESS RIGHTS
## (Against All Defendants)

320.     Plaintiff re-alleges and incorporates herein by reference all paragraphs as if alleged herein.

321.     At all relevant times, the Defendants were acting under color of law.

322.     Defendants' Teaneck, Melfi, Myszka, BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown took the actions of unlawfully denying Plaintiffs a full and fair hearing, permits, variances, and a certificate of occupancy without any legitimate hearing or process.

323.     The Defendants' actions violate the Due Process clause as Plaintiffs are entitled to a legitimate process in reviewing their applications.

324.     Plaintiffs were deprived of process in order to unlawfully discriminate against them and cover up the discriminatory actions of the Defendants.

325.     This included Defendant Melfi and Teaneck denying Plaintiffs' permit applications, including for a ramp they granted to a church under the same circumstances, forcing them to go to Defendant BOA, and then continually participating and colluding with Defendant BOA and its Defendant members to engage in discriminatory conduct aimed at frustrating and denying Plaintiffs' application.

326.     This also includes discriminating against Plaintiffs on the basis of religion throughout the permit and BOA process, including unlawfully denying permits, delaying,

frustrating, imposing inapplicable rules and regulations upon Plaintiffs, and treating them

in a disparate and discriminatory manner

327.　　　In addition, even of the regulations were to apply to Plaintiffs, Defendants'

application of these regulations was unequal, discriminatory, and imposed upon Plaintiffs

in a way to inhibit the Islamic Center's existence, use, and functions.

## COUNT VII- VIOLATION OF THE UNITED STATES CONSTITUTION-FREE EXERCISE OF RELIGION AND RELIGIOUS DISCRIMINATION: FIRST AND FOURTEENTH AMENDMENTS
### (Against All Defendants)

328.　　　 Plaintiffs re-allege and incorporate herein by reference all paragraphs as if

alleged herein.

329.　　　Defendants' Teaneck, Melfi, Myszka, BOA, Jan Meyer, Harvey Rosen, Daniel

Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman,

Mark Mermelstein, Zev Green, and James Brown actions as alleged herein violate

Plaintiffs' right to free exercise of religion, right to assembly, and substantive rights.

330.　　　Defendants inhibited and prohibited Plaintiffs from operating their Islamic Center,

including praying, fasting, having communal events, engaging in recreational activities,

fellowship, and celebrating with the community Islamic holidays and traditions, which

require group gatherings.

331.　　　Defendants Teaneck, Melfi, Myszka, BOA, Jan Meyer, Harvey Rosen, Daniel

Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman,

Mark Mermelstein, Zev Green, and James Brown denied permits and variances to the

Plaintiffs despite the fact that Plaintiffs qualified for same and there were no regulations in the P Zone.

332.     Defendant Melfi is the highest policy maker and arbiter regarding permits for Teaneck, and decides in his sole discretion which permit applications are granted or denied. He wielded this power against Plaintiffs in unlawfully manner on behalf of Defendant Teaneck.

333.     Defendants have also violated Plaintiffs' rights under the Free Exercise clause by imposing a substantial burden upon the exercise of Plaintiffs' religion.

334.     The substantial burden has been imposed by the discriminatory and arbitrary refusal to grant permit, imposition of inapplicable requirements upon them, putting Plaintiffs through a sham application process in the BOA, and taxing them unlawfully.

335.     Defendants have unreasonably placed burdens upon the Plaintiffs, violating the Plaintiffs' Constitutional Rights the effect of which is to deny the Islamic Center from lawfully opening and servicing the Islamic Community. Whether through the unlawful permitting process, the BOA application process, or through rezoning, at each step the Defendants imposed additional burdens and requirements that prohibited Plaintiffs from opening.

336.     Defendants have treated Plaintiffs unequally and in a disparate manner in relation to other secular organizations and religious institutions.

337.     Defendants have not afforded Plaintiffs equal treatment or protection, either through the initial permitting process with Defendants Melfi and Teaneck or the subsequent sham application process before Defendants BOA, Jan Meyer, Harvey Rosen,

Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown.

338.    Further, Defendants Melfi and Teaneck denied Plaintiffs' permit applications, including for a ramp they approved for a church under the same circumstances, forcing them to go to Defendant BOA, and then continually participating and colluding with Defendant BOA and its Defendant members to engage in discriminatory conduct aimed at frustrating and denying Plaintiffs' application.

339.    Defendants Teaneck, BOA, and its members discriminated against Plaintiffs on the basis of religion throughout the permit and BOA process, including unlawfully denying permits, delaying, frustrating, imposing inapplicable rules and regulations upon Plaintiffs, and treating them in a disparate and discriminatory manner

340.    Defendant Teaneck also rezoned the property while this litigation is pending to imposed additional, previously not required requirements upon Plaintiffs that has the effect of inhibiting the lawful operation of the Islamic Center.

341.    Indeed, the rezoning of the Plaintiffs' property both concedes that no previous regulation applied and at all times Defendants' actions were discriminatory and aimed at unlawfully inhibiting the Plaintiffs' rights under RLUIPA, the NJCRA, by imposing requirements that did not exist, and the constitution, as well as other rights, and that the Defendants sought to retaliate against the Plaintiffs for filing this action and pursuing their claims.

342.    Defendants wasted more than two years of Plaintiffs' time and substantial resources by giving them the run around in the Defendant Township's permitting process

57

then the Defendants BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown, all the while the Defendants could have rezoned the property and or simply granted the Plaintiffs the permits they sought and/or the variances that Plaintiffs were entitled to.

343.     The impediments, disparate treatment and impact, and burdens placed upon Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

## COUNT VIII-VIOLATION OF THE NEW JERSEY CONSTITUTION-FREE EXERCISE OF RELIGION AND RELIGIOUS DISCRIMINATION
### (Against All Defendants)

344.     Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

345.     Article I, Paragraph 3 of the New Jersey Constitution guarantees the free exercise of religion.

346.     Defendants Teaneck, Melfi, Myszka, BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown actions as alleged herein violate Plaintiffs' right to free exercise of religion.

347.     Defendant Melfi is the highest policy maker and arbiter regarding permits for Teaneck, and decides in his sole discretion which permit applications are granted or denied. He wielded this power against Plaintiffs in unlawfully manner on behalf of Defendant Teaneck.

348.     Defendants have violated Plaintiffs' rights under the Free Exercise clause by imposing a substantial burden upon the exercise of Plaintiffs' religion.

349.     Defendants also rezoned the property while this litigation is pending to imposed additional, previously not required requirements upon Plaintiffs.

350.     Indeed, the rezoning of the Plaintiffs' property both concedes that no previous regulation applied and at all times Defendants' actions were discriminatory and aimed at unlawfully inhibiting the Plaintiffs' rights under the NJCRA and NJ Constitution, by imposing requirements that did not exist, and the constitution, as well as other rights, and that the Defendants sought to retaliate against the Plaintiffs for filing this action and pursuing their claims.

351.     Defendants wasted more than two years of Plaintiffs' time and substantial resources by giving them the run around in the Township permitting process then the BOA, all the while the Defendants could have rezoned the property and or simply granted the Plaintiffs the permits they sought and/or the variances that Plaintiffs were entitled to.

352.     The impediments, disparate treatment and impact, and burdens placed upon Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

353.     The substantial burden has been imposed by the discriminatory and arbitrary revocation of Plaintiffs' permit, imposition of inapplicable requirements upon them, and taxing them unlawfully.

354.     Lastly, Defendants discriminated against Plaintiffs on the basis of religion when Defendants Melfi and Teaneck denied Plaintiffs' permit applications, including for a ramp they granted to a Church under the same circumstances, forcing them to go to

Defendant BOA, and then continually participating and colluding with Defendant BOA

and its Defendant members to engage in discriminatory conduct aimed at frustrating and

denying Plaintiffs' application.

355.     Defendants also discriminated against Plaintiffs on the basis of religion

throughout the permit and BOA process, including unlawfully denying permits, delaying,

frustrating, imposing inapplicable rules and regulations upon Plaintiffs, and treating them

in a disparate and discriminatory manner.

## COUNT IX-VIOLATION OF THE UNITED STATES CONSTITUTION FOURTEENTH AMENDMENT-EQUAL PROTECTION
### (Against All Defendants)

356.     Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged

herein.

357.     The Defendants Teaneck, Melfi, Myszka, BOA, Jan Meyer, Harvey Rosen,

Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif

Rehman, Mark Mermelstein, Zev Green, and James Brown conduct as described herein

violated and continue to violate Plaintiffs' rights under the Equal Protection Clause by

intentionally treating Plaintiffs' differently from other entities on the basis of religious

belief.

358.     Defendant Melfi is the highest policy maker and arbiter regarding permits for

Teaneck, and decides in his sole discretion which permit applications are granted or

denied. He wielded this power against Plaintiffs in unlawfully manner on behalf of

Defendant Teaneck.

359.      Defendants BOA and Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis,
Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev
Green, and James Brown worked collectively to discriminate against Plaintiffs, treat them
differently on the basis of religion, and work to deny Plaintiffs' applications—all of
which could only be possible through the direct involvement of each BOA member.
Indeed, all but one member voted to deny the Plaintiff's application after it should have
been granted, and after almost two years of obviously unlawful delays, tactics to frustrate
Plaintiffs, glaringly disparate treatment, and blatant discrimination by BOA members.

360.      Defendants also discriminated against Plaintiffs on the basis of religion
throughout the permit and BOA process, including unlawfully denying permits, delaying,
frustrating, imposing inapplicable rules and regulations upon Plaintiffs, and treating them
in a disparate and discriminatory manner.

361.      Defendant Teaneck also rezoned the property while this litigation is pending to
imposed additional, previously not required requirements upon Plaintiffs.

362.      Defendant Teaneck at no point rezoned any other property like it did with
Plaintiff. Plaintiff was treated unequally than other religious entities that were not subject
to spot zoning where additional requirements were imposed upon them that were not
previously applicable.

363.      Indeed, the rezoning of the Plaintiffs' property both concedes that no previous
regulation applied and at all times Defendants' actions were discriminatory and aimed at
unlawfully inhibiting the Plaintiffs' rights by imposing requirements that did not exist,

and that the Defendants sought to retaliate against the Plaintiffs for filing this action and pursuing their claims.

364.      The impediments, disparate treatment and impact, and burdens placed upon Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

365.      Defendants' unlawful conduct includes, but is not limited to, treating Plaintiffs differently in the permitting process, variance process, and certificate of occupancy, unilaterally refusing to issue permits that should have immediately been issues, and taxing them despite their tax-exempt status.

366.      Defendants Melfi and Teaneck also denied Plaintiffs' permit applications, including for a ramp (when they granted the same application for a Church), forcing them to go to Defendant BOA, and then continually participating and colluding with Defendant BOA and its Defendant members to engage in discriminatory conduct aimed at frustrating and denying Plaintiffs' application.

## COUNT X- VIOLATION OF THE NEW JERSEY CONSTITUTION-EQUAL PROTECTION
### (Against All Defendants)

367.      Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

368.      The Defendants' Teaneck, Melfi, Myszka, BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown conduct as described herein violated and continue to violate Plaintiffs' rights under the Equal Protection Clause,

Article I, Paragraphs 1 and 5, by intentionally treating Plaintiffs differently from other entities on the basis of religious belief as set forth herein.

369.     Defendant Melfi is the highest policy maker and arbiter regarding permits for Teaneck, and decides in his sole discretion which permit applications are granted or denied. He wielded this power against Plaintiffs in unlawfully manner on behalf of Defendant Teaneck.

370.     Defendants BOA and Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown worked collectively to discriminate against Plaintiffs, treat them differently on the basis of religion, and work to deny Plaintiffs' applications—all of which could only be possible through the direct involvement of each BOA members. Indeed, all but one member voted to deny the Plaintiff's application after it should have been granted, and after almost two years of obviously unlawful delays, tactics to frustrate Plaintiffs, glaringly disparate treatment, and blatant discrimination by BOA members.

371.     Defendants also discriminated against Plaintiffs on the basis of religion throughout the permit and BOA process, including unlawfully denying permits, delaying, frustrating, imposing inapplicable rules and regulations upon Plaintiffs, and treating them in a disparate and discriminatory manner.

372.     Defendants also rezoned the property while this litigation is pending to imposed additional, previously not required requirements upon Plaintiffs.

373.     Defendant Melfi and Teaneck denied Plaintiffs' permit applications that they granted to a Church, including for a ramp, and then forced them to go to Defendant BOA,

and then continually participating and colluding with Defendant BOA and its Defendant members to engage in discriminatory conduct aimed at frustrating and denying Plaintiffs' application. Defendants wasted more than two years of Plaintiffs' time and millions of resources by giving them the run around in the Township permitting process then the BOA, all the while the Defendants could have rezoned the property and or simply granted the Plaintiffs the permits they sought and/or the variances that Plaintiffs were entitled to.

374.     The impediments, disparate treatment and impact, and burdens placed upon Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

375.     Defendants' unlawful conduct includes, but is not limited to, treating Plaintiffs differently in the permitting and variance process, refusal to provide a certificate of occupancy, unilaterally revoking their permits, and taxing them despite their tax-exempt status.

## COUNT XI- NEW JERSEY MUNICPAL LAND USE LAW
### (Defendant Teaneck)

376.     Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

377.     Defendant Teaneck rezoned the property while this litigation is pending to imposed additional, previously not required requirements upon Plaintiffs.

378.     Indeed, the rezoning of the Plaintiffs' property both concedes that no previous regulation applied and at all times Defendants' actions were discriminatory and aimed at unlawfully inhibiting the Plaintiffs' rights by imposing requirements that did not exist for

an area that did not require rezoning or was unequal in that it touched upon only one property but no other properties within other P zones in Teaneck.

379.     The impediments, disparate treatment and impact, and burdens placed upon Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

380.     N.J.S.A. Section 40:55 D-1 and New Jersey common law prohibit a municipality from exercising its land use powers in a manner that is arbitrary, capricious, or unreasonable, and not supported by substantial evidence.

381.     Defendant Teaneck has acted in an arbitrary, capricious, and unreasonable manner.  Indeed, the failure to issue permits to the Plaintiffs where there were no restrictions, then the sham BOA process as described herein, and the eventual rezoning of the property were unlawful, arbitrary, unreasonable, and capricious.

382.     Defendants' actions violate NJSA Section 40:55.

## COUNT XII- NEW JERSEY MUNICPAL LAND USE LAW
### (All Defendants)

383.     Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

384.     Defendants' BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown actions of imposing costs and fees in the tens of thousands of dollars constitute an unlawful tax, substantial burden, and other unlawful restriction upon Plaintiffs.

385.     The impediments, disparate treatment and impact, and burdens placed upon

Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

386.     Defendants' BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis,

Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev

Green, and James Brown imposition of these astronomical fees and costs are unlawful.

387.     Defendants' actions of frustrating and delaying Plaintiffs' permit application,

BOA application, as well as the imposition of these costs and fees violates Plaintiffs'

rights.

388.     Defendants discriminated against Plaintiffs and acted in a capricious and arbitrary

manner throughout the permit and BOA process, including unlawfully denying permits,

delaying, frustrating, imposing inapplicable rules and regulations upon Plaintiffs, and

treating them in a disparate and discriminatory manner.

### COUNT XIII-AIDING AND ABBETTING
### (Against All Defendants)

389.     Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged
herein.

390.     Defendants Teaneck, Melfi, Myszka, BOA, Jan Meyer, Harvey Rosen, Daniel

Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman,

Mark Mermelstein, Zev Green, and James Brown aided and abetted each other in the

unlawful discrimination as discussed herein.

391.     Each Defendant participated in discriminating against Plaintiffs throughout the

permitting, BOA, and rezoning instances.

392.     Defendants imposed discriminatory rules and regulations, discriminatorily applied zoning and permit laws, and sought to unlawfully inhibit the use of the Islamic center.

393.     Each Defendant acted in concert with each other and others to perpetuate the conduct complained of herein. Teaneck, Melfi, Myszka, BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown all worked together to discriminate against the Plaintiffs and violate their rights. Indeed, Teaneck, Melfi, and Myszka worked together to unlawfully deny Plaintiffs' permits, often using nonsensical or fabricated issued and tickets to do so. This had the effect of forcing Plaintiffs to the BOA, despite no legal requirement to do so.

394.     Defendants Teaneck, Melfi aided and abetted Defendants BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown in maintaining a sham BOA application process that was aimed at inhibiting the opening and operation of the Plaintiff. Defendant Melfi worked with Defendants BOA and its members to issues erroneous calculations and parking requirements, which they all knew to be improper and aimed at delaying the Plaintiffs' application.

395.     Defendants BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown worked with each other to delay and frustrate Plaintiffs' application so as to inhibit the opening and operation of the Islamic Center. As laid out more fully above, Defendant Meyer set the tone to permit delays and questioning that

67

was aimed at frustrating the application. Defendant Mulligan's animus was so clear, he could be heard making discriminatory comments about camel parking and "these people." He and his co-Defendants on the BOA then engaged in endless questioning aimed at frustrating the application, including asking about snow removal, the number of toilets in the facility, and double or tripling the parking requirements. The other Defendant BOA members permitted this unlawful conduct to occur, condoned it, and then, voted in unison to deny Plaintiffs' application as they observed the frustration and delay that was visited upon the Plaintiffs for years, and in stark contrast as to how they treated other religious and secular entities.

396.    That Defendants BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown continuously watched the disparate and unlawful treatment of Plaintiffs in stark contrast of how they treated other applications, mandated that they act and as a result constitutes direct participation, condoning, and aiding and abetting the unlawful conduct of each other.

397.    Additionally, Defendant Melfi and Teaneck denied Plaintiffs' permit applications, including for a ramp that they granted for a Church under the same circumstances, forcing them to go to Defendant BOA, and then continually participating and colluding with Defendant BOA and its Defendant members to engage in discriminatory conduct aimed at frustrating and denying Plaintiffs' application.

398.    Defendant Teaneck also rezoned the property while this litigation is pending to imposed additional, previously not required requirements upon Plaintiffs. This further

aided and abetted the conduct of Defendant Melfi, the BOA, and the BOA members who began the process to inhibit the lawful operation of the Plaintiff by denying permits, making Plaintiffs engage in a sham application process, denying the application, and then rezoning the property such that its existing requirements now do not comport with the buildings longstanding footprint and thus merely existing as it had for years now requires the Plaintiffs to go back to the discriminatory BOA.

399.     Indeed, the rezoning of the Plaintiffs' property both concedes that no previous regulation applied and at all times Defendants' actions were discriminatory and aimed at unlawfully inhibiting the Plaintiffs' rights under RLUIPA, the NJCRA, by imposing requirements that did not exist, and the constitution, as well as other rights, and that the Defendants sought to retaliate against the Plaintiffs for filing this action and pursuing their claims.

400.     Defendants wasted more than two years of Plaintiffs' time and substantial resources by giving them the run around in the Township permitting process then the BOA, all the while the Defendants could have rezoned the property and or simply granted the Plaintiffs the permits they sought and/or the variances that Plaintiffs were entitled to.

401.     The impediments, disparate treatment and impact, and burdens placed upon Plaintiffs do not survive scrutiny and have no legitimate governmental purpose.

## COUNT XIV-RETALIATION AND AID AND ABET
### (Against Defendant Teaneck)

402.     Plaintiffs re-allege and incorporate herein by reference all paragraphs as if alleged herein.

69

403.     During the pendency of this matter, Teaneck's City Council, aided and abetted by the individual Defendant Melfi, rezoned the Plaintiffs' property to impose requirements upon their property that did not otherwise exist.

404.     In an apparent concession that there were no restrictions in the P Zone as Plaintiffs have long stated, the Defendants rezoned the property to impose various previously inapplicable requirements, including for lot coverage and other zoning rules.

405.     The effect of the Defendant Teaneck's conduct was to make the property as it now exists and has always existed illegal, non-conforming, and now requires that the Plaintiffs have to go back to the BOA, where they will no doubt suffer from the same delay, frustrating, and unlawful conduct of the Defendants BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown as outlined herein.

406.     While Defendant Teaneck claims altruism in rezoning the property, the fact of the matter is Defendant Teaneck, in the middle of a litigation contesting the unlawful actions of the Defendant BOA and its members, mandate that Plaintiffs return to that very BOA. This ensures that not only do Plaintiffs have to go before the BOA when they previously did not have to, but that there will continue to be years of delay and frustration ahead of them.

407.     The actions of rezoning the property were aimed at punishing the Plaintiffs for suing Defendants Teaneck, Melfi, Myszka, BOA, Jan Meyer, Harvey Rosen, Daniel Wetrin, Monica Honis, Jennifer Prince, Jerry L. Barta, Edward Mulligan, Atif Rehman, Mark Mermelstein, Zev Green, and James Brown.

408.      Defendants' actions were retaliatory, violated the Plaintiffs' First and Fourteenth

Amendment rights for freedom of speech, religion, and substantive rights, as well

Plaintiffs' LAD, RLUIPA, NJCRA, and other rights.

409.      Defendant Teaneck's actions are perpetrated by its Town Council, the Townships

chief policy makers, and thus makes the Teaneck liable under *Monell* as well.

410.      But for the Plaintiffs asserting this lawsuit, the Township would not have rezoned

the property to impose the requirements that did not otherwise exist.

411.      Furthermore, no other secular or religious entity were subject to a rezoning simply

because they sought to vindicate their rights.

## <u>RELIEF SOUGHT AS TO ALL COUNTS</u>

**WHEREFORE**, Plaintiff prays that the Court enter an order that:

A.      Declaratory Judgment and Order that the Defendants' denial of Plaintiffs' permit,

variance, and certificate of occupancy, and the refusal to provide same, as alleged herein, violate

their Rights;

B.      Declaratory Judgment and Order that that the Defendants' continued denial of

Plaintiffs' permit, variance, and certificate of occupancy, and the rescinding of Plaintiffs'

previously approve permit and certificate of occupancy, as alleged herein, was arbitrary,

capricious, unreasonable and without a valid governmental purpose;

C.      Enjoining the Defendants and all other persons in concert or participation with

Defendants, from refusing to lawfully accept and review Plaintiffs' applications and submission

in good faith, and upon lawful review of the applications issue all necessary permits, variances,

and approvals for Plaintiffs and certificate of occupancy

71

D.      Enter a temporary restraining order and/or preliminary and permanent injunctions enjoining the Defendants, as well as all other officers, employees, agents and attorneys of the City of Teaneck, and all persons in active concert or participating with any of them, from interfering with the operation of Plaintiffs house of worship and religious facility;

E.      Enter a temporary restraining order and/or preliminary and permanent injunctions enjoining the Defendants, as well as all other officers, employees, agents and attorneys of the City of Teaneck, and all persons in active concert or participating with any of them from unlawfully denying, and/or withholding Plaintiffs' permit or any other permit or regulation for the operation of its house of worship and religious facility;

F.      Grant an award of reasonable costs and attorneys' fees;

G.      Grant an award of compensatory and punitive damages pursuant to RLUIPA, 42 U.S.C. Section 2000cc et seq., 42 USC 1983, the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 et sq.; and,

H.      Appointment of a federal monitor to oversee Defendants' implementation and compliance with this Court's remedial powers, as well as Defendants continuing compliance with federal law for a period of time determined by the Court;

I.      Declaratory Judgment and Order that the actions described above and applications are unlawful and in violation of the Constitutions of the Unites States and New Jersey:

J.      Declaratory Judgment and Order that Plaintiffs does not have to pay any of the costs and fees demanded by Defendants;

K.      Declaratory Judgment and Order that the New Ordinance imposed upon

Plaintiffs that contain any restrictions that did not previous apply be deemed null, void,

and inapplicable to the Property;

L.      Punitive damages against the individual Defendants as permitted by law;

M.      Award compensatory, consequential, and other damages to Plaintiffs;

N.      All other remedies and rights afforded under the law and the Court deems just and

proper.

Dated: November 18, 2022                              Respectfully submitted,

s/Aymen A. Aboushi                          s/ Joel S. Silberman
Aymen A. Aboushi, Esq.                       Joel S. Silberman, Esq.
The Aboushi Law Firm                         Law Offices of Joel Silberman
1441 Broadway, 5th Floor                     26 Journal Square, #300
New York, NY 10018                           Jersey City, NJ 07306
Tel: (212) 391-8500                          Tel. (201) 420-1913
Fax: (212) 391-8508                          Fax (201) 420-1914

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), the Plaintiff demands a trial by jury of all issues so

triable as of right.

## CERTIFICATION

In accordance with Local Civil Rule 11.2, I hereby certify that this matter is not
the subject of any other action pending in any court, or of any pending arbitration, or
administrative proceeding.  In accordance with Local Civil Rule 201.1(d)(1) & (2)(A), I certify
that this matter is not subject to compulsory arbitration or to mediation because this action is
based on an alleged violation of a right secured by the Constitution of the United States, and
because the relief sought includes money damages in excess of $150,000, exclusive of interest
and costs, and any claim for punitive damages, in addition to declaratory and injunctive relief.

s/Aymen A. Aboushi
Aymen Aboushi, Esq.